No. 23-14115

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

IN RE: SECRETARY, STATE OF GEORGIA,

*Petitioner.*

On Petition for Mandamus to the United States District Court for the Northern District of Georgia, Case No. 1:17-cv-02989-AT, Hon. Amy Totenberg

## OPPOSITION OF RESPONDENTS TO MANDAMUS PETITION

Bruce P. Brown
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
Tel: (404) 386-6856
bbrown@brucepbrownlaw.com

*Counsel for Respondents Coalition for Good Governance, William Digges III, Laura Digges, & Megan Missett*

JOSEPH R. PALMORE
DAVID D. CROSS
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C. 20037
Telephone:  (202) 887-6940
JPalmore@mofo.com

HALSEY G. KNAPP, JR.
ADAM M. SPARKS
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Respondents Donna Curling, Donna Price, & Jeffrey Schoenberg*

DECEMBER 29, 2023

**NOTICE REGARDING CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1.1-26.1.3, undersigned counsel of record for mandamus respondents Donna Curling, Donna Price, and Jeffrey Schoenberg identifies the following interested persons omitted from the Certificate of Interested Persons contained in Defendants-Appellants' opening brief:

1.    Palmore, Joseph R., counsel for mandamus respondents Donna Curling, Donna Price, and Jeffrey Schoenberg;

2.    Wacks, Joel F., counsel for mandamus respondents Donna Curling, Donna Price, and Jeffrey Schoenberg.

Dated:  December 29, 2023                    /s/ Joseph R. Palmore

C-1

# TABLE OF CONTENTS

NOTICE REGARDING CERTIFICATE OF INTERESTED PERSONS............C-1

TABLE OF AUTHORITIES ......................................................................ii

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUE ...............................................................2

STATEMENT OF THE CASE.................................................................2

    A.    Georgia's voting system and its grave vulnerabilities ........................2

    B.    Plaintiffs' lawsuit ...............................................................5

    C.    Secretary Raffensperger ........................................................7

        1.    Plaintiffs' attempts to gather information from other witnesses ........................................................................8

        2.    Secretary Raffensperger's public statements............................12

        3.    Trial subpoena.......................................................16

        4.    Subsequent developments.........................................18

STANDARD OF REVIEW ....................................................................19

ARGUMENT .........................................................................................20

    A.    Plaintiffs Established A "Special Need" for Secretary Raffensperger's Testimony ......................................................20

    B.    The Secretary's Objections To The District Court's Order Lack Merit ..............................................................................26

CONCLUSION ......................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. J & Const. v. City of Atl. Dep't of Aviation*,
  175 F.R.D. 347 (N.D. Ga. 1997) ...............................................................17, 22

*In re BellSouth Corp.*,
  334 F.3d 941 (11th Cir. 2003) ....................................................................20, 26

*Bogan v. City of Boston*,
  489 F.3d 417 (1st Cir. 2017)................................................................................29

*Celentano v. Nocco*,
  No. 8:15-cv-1461-T-30AAS, 2016 WL 4943939
  (M.D. Fla. Sept. 16, 2016) ...................................................................................22

*Curling v. Raffensperger*,
  No. 1:17-cv-2989-AT, 2023 WL 7463462
  (N.D. Ga. Nov. 10, 2023) ........................ 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 14, 15, 24

*Curling v. Sec'y of Georgia*,
  761 F. App'x 927 (11th Cir. 2019)....................................................................6, 7

*Fair Fight Action, Inc. v. Raffensperger*,
  333 F.R.D. 689 (N.D. Ga. 2019) ....................................... 17, 20, 21, 22, 23, 25

*Greater Birmingham Ministries v. Merrill*,
  321 F.R.D. 406 (N.D. Ala. 2017) ............................................................17, 22

*Davis ex rel. J.D.D. v. Carroll*,
  No. 8:16-CV-0998-T-35MAP, 2017 WL 11151858
  (M.D. Fla. July 24, 2017).....................................................................................20

*In re Lopez-Lukis*,
  113 F.3d 1187 (11th Cir. 1997) ........................................................................20

*McDaniel v. Bradshaw*,
  No. 10-81082-CIV, 2011 WL 13150501 (S.D. Fla. May 23, 2011) .................21

*In re Moody*,
755 F.3d 891 (11th Cir. 2014) ...................................................................20

*In re Paxton*,
60 F.4th 252 (5th Cir. 2023) ...............................................................28, 29

*Simplex Time Recorder Co. v. Sec'y of Labor*,
766 F.2d 575 (D.C. Cir. 1985) ...............................................................29

*U.S Bd. of Parole v. Merhige*,
487 F.2d 25 (4th Cir. 1973) ..............................................................29, 30

*In re United States*,
985 F.2d 510 (11th Cir. 1993) .....................................................17, 18, 21, 22

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ...............................................................19

*In re University of Michigan*,
936 F.3d 460 (6th Cir. 2019) ...................................................................30

*In re USA*,
624 F.3d 1368 (11th Cir. 2010) ...............................................................21

*Walter Int'l Prods., Inc. v. Salinas*,
650 F.3d 1402 (11th Cir. 2011) ...............................................................19

## Other Authorities

Ga. Sec'y of State, *About Secretary Raffensperger*
https://sos.ga.gov/page/about-secretary-raffensperger
(last visited Dec. 27, 2023) ...................................................................8

Ga. Sec'y of State Press Release, *Secretary Raffensperger Calls on J.
Alex Halderman to Agree to Release "Secret Report" and Pre-
Election Testimony* (Jan. 27, 2022),
https://sos.ga.gov/news/secretary-raffensperger-calls-j-alex-
halderman-agree-release-secret-report-and-pre-election ...................................13

Ga. Sec'y of State Press Release, *Secretary Raffensperger Joins
Colleagues in Calling for Restored Trust in Electoral Systems*
(Dec. 6, 2023), https://sos.ga.gov/news/secretary-raffensperger-
joins-colleagues-calling-restored-trust-electoral-systems ...................................14

Brad Raffensperger, *Integrity Counts* (2021) .......................................................2, 31

Secretary Brad Raffensperger, *Remarks to the General Assembly:*
   *Setting the Election Security Record Straight* (June 20, 2023),
   https://sos.ga.gov/news/setting-election-security-record-straight ...............13, 14

## INTRODUCTION

Mandamus petitioner, Georgia Secretary of State Brad Raffensperger, falls far short of establishing the clear and indisputable entitlement to relief required for mandamus. He seeks this Court's emergency intervention to avoid testifying for only *75 minutes* (plus limited redirect) at a January trial on the security and reliability of Georgia's voting system that he administers. And he does so even though, as the district court found, he has "direct personal factual information pertaining to material issues" that will be contested at trial. Pet. Ex. 9 at 3. Indeed, defendants' witnesses repeatedly testified in depositions that they did not possess highly relevant factual information and that only Secretary Raffensperger did. That evidentiary gap was foundational to the district court's order, yet the Secretary's mandamus petition misleadingly ignores it.

Given the centrality of Secretary Raffensperger's testimony to the issues at trial and Plaintiffs' inability to secure the needed information from any other witness, the district court acted well within its broad trial-management discretion when ordering him to testify. At the same time, the court showed appropriate awareness of Secretary Raffensperger's position and the demands on his time by imposing a significant time limit on his testimony.

The Secretary himself has recognized the necessity of courtroom testimony to the fact-finding process. As he wrote in his recent book *Integrity Counts,* "[t]he

1

ultimate fact-check in the United States [], occurs in courts of law, where witnesses swear to tell the truth or risk imprisonment and where lawyers must also tell the truth or risk disbarment. If you want to know the truth, watch what happens in court." Brad Raffensperger, *Integrity Counts* 143 (2021).

The petition should be denied.

## STATEMENT OF THE ISSUE

Whether petitioner has satisfied the mandamus standard by showing he is clearly and indisputably entitled to relief from an order requiring him to testify for 75 minutes (plus redirect) at a trial on factual matters about which he has personal, firsthand knowledge unavailable from other witnesses.

## STATEMENT OF THE CASE

### A.    Georgia's voting system and its grave vulnerabilities

Most jurisdictions in the United States use hand-marked paper ballots tabulated by scanners as the main form of balloting.  Resp. Ex. 11 at 31; Resp. Ex. 13 at 9-11.  Georgia, however, is one of the only States to require in-person voters to cast votes on electronic touchscreen machines known as ballot marking devices or BMDs.  *Curling v. Raffensperger*, No. 1:17-cv-2989-AT, 2023 WL 7463462, at *9- *11 (N.D. Ga. Nov. 10, 2023).

Georgia's BMD system has been plagued by numerous problems creating substantial barriers to voting. *Id.* at *12-*24; *see id.* at *45 (district court noting that

it found in 2020 that the "substantial risks and long-run threats posed by Georgia's BMD system" were "evident," and included "serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted" and that the "evidentiary record" has grown even stronger since then.) (citation omitted). In particular, the State's administration of its electronic voting system, including its poor cybersecurity practices, has left this system open to attack. *Id.* at *12-*19. Yet Georgia's system offers voters no way of checking that the machines captured their votes correctly, as it is supposed to record votes on a QR barcode that humans cannot read. *Id.* at *12-*13. The State has also taken shortcuts in Logic and Accuracy testing, contributing to the impossibility of meaningfully auditing its BMD system. *Id.* at *13.

Dr. Alex Halderman, Plaintiffs' expert, "determined that the BMD and related voting equipment suffered from 'critical vulnerabilities' that could 'be exploited to subvert all of [the BMD's] security mechanisms." *Id.* at *14 (citation omitted; brackets in original); *see id.* at *14-*17 (summarizing Halderman's report and the "7 Core Vulnerabilities" in Georgia's BMD system he identified); *id.* at *1 n.2 ("[S]ome of the nation's leading cybersecurity experts and computer scientists have provided testimony and affidavits on behalf of Plaintiffs' case in the long course of this litigation."). In 2022, the U.S. Department of Homeland Security's

Cybersecurity and Infrastructure Agency (CISA) issued a public advisory "confirm[ing] many of the vulnerabilities identified by Dr. Halderman." *Id.* at *17. CISA recommended that jurisdictions using Dominion BMDs install software and firmware updates to address some of these vulnerabilities. But, "a number of critical software updates related to the operation of Dominion's software and equipment have not been purchased or installed in Georgia." *Id.* at *18. CISA also recommended a number of "mitigation steps" jurisdictions could take to reduce security risks related to BMDs. *Id.* But as the district court recently observed, "no evidence has been presented that the State Defendants have implemented CISA's recommended mitigation steps." *Id.*

The grave vulnerabilities in Georgia's voting system were further exposed by the breaches of Georgia's voting system in Coffee County starting on January 7, 2021. *Id.* at *19-*27. As the district court summarized, those breaches involved "various individuals and entities": "(1) providing and gaining unauthorized access to Coffee County voting equipment, data, and software over the course of multiple dates;" "(2) copying, downloading, and imaging the County's equipment, data, and software;" "(3) uploading and sharing that data and software on the internet via a file-sharing website;" and "(4) further distributing physical copies of forensic voting material downloaded from Coffee County." *Id.* at *19; *see id.* at *1 (noting that several individuals involved in the Coffee County breaches were indicted in the

pending RICO criminal case in Fulton County Superior Court). Plaintiffs' experts found that this "copying and broad distribution of voting system data and software materially increases the risk that a future Georgia election will be attacked—especially because all 159 counties in Georgia use the same voting system software and system configurations." *Id.* at *19.

Georgia's BMDs are thus riddled with serious vulnerabilities in an environment of advanced persistent threats to U.S. elections by sophisticated actors. The upshot is that voters who wish to vote in person are forced to cast their votes on machines that cannot reasonably ensure their votes will be recorded accurately.

**B.    Plaintiffs' lawsuit**

In 2017, individual Georgia voters and the Coalition for Good Governance filed suit in state court against then-Secretary of State Brian Kemp and other defendants.[1] *Id.* at *5. Plaintiffs coalesced into two groups, the "Curling Plaintiffs" (Donna Curling, Donna Price, Jeffrey Schoenberg) and the "Coalition Plaintiffs" (Laura Digges, William Digges III, Ricardo Davis, Megan Misset, and the Coalition for Good Governance). *Id.* at *6 n.9; *see id.* at *3 (district court glossary of people involved in case).

---

[1] Secretary Raffensperger was substituted as a defendant in his official capacity after he assumed the office in January 2019.

Early litigation focused principally on the electronic touchscreen voting machines Georgia used at the time. *Id.* at *5-*9. Those machines, known as Direct Recording Electronic (DRE) machines, were predecessors to the current BMDs. *Id.* at *5. Plaintiffs' second amended complaint in 2017 challenged the unreliable and unsecured DRE system as unlawful, including because it violated the fundamental right to vote guaranteed by the Due Process Clause of the Fourteenth Amendment. *Id.* Plaintiffs sought, among other things, to enjoin use of the DRE voting system. *Id.* at *6.

Before the 2018 general election, Plaintiffs moved for preliminary injunctions against the use of electronic voting machines. *Id.* The district court found that the DRE system "pose[d] a concrete risk of alteration of ballot counts that would impact [plaintiffs'] own votes." *Id.* (citation omitted; first bracket in original). But the court ultimately denied a preliminary injunction due to timing concerns, concluding an injunction on the eve of 2018 elections "would undermine the government's and the public's interest in the orderly administration of elections." *Id.* At the same time, the court "expressly warned Defendants that further delay by the State in remediating its technologically outdated and vulnerable voting system would be intolerable." *Id.* (citation omitted).[2]

---

[2] At the same time, the district court denied a motion by State Defendants to dismiss on standing, sovereign-immunity, and legislative-immunity grounds. *Curling v. Sec'y of Georgia*, 761 F. App'x 927, 930 (11th Cir. 2019) (discussing district court

Plaintiffs moved for preliminary injunctions before the 2019 local elections. *Id.* at *6. As to electronic voting machines, the district court again found the DRE machines constitutionally deficient. *Id.* at *7-*9. The court enjoined the use of DRE machines, with the injunction taking effect after 2019 in time for the 2020 presidential election cycle. See *Id.* at *9. State Defendants did not appeal the injunction against the DRE machines or any aspect of that order; instead, Georgia enacted legislation replacing the DRE machines with the BMD machines, which, as explained above, are also unreliable and insecure. *Id.* at *9-*10. In 2019, Plaintiffs filed amended complaints asserting constitutional challenges to the BMD system. *Id.* at *11.

In January 2023, State Defendants moved for summary judgment. *Id.* at *28. The district court granted in part and denied in part, allowing plaintiffs' constitutional claims against the BMD voting system to proceed to trial. *Id.* at *44-*49. Trial is scheduled for January 9, 2024. *Id.* at *55.

C.    **Secretary Raffensperger**

Secretary Raffensperger, the lead defendant in this case, has ultimate responsibility for the actions (or inactions) of his Office and directed activities

---

decision). State Defendants filed an interlocutory appeal from that denial. *Id.* This Court dismissed the appeal as to standing. *Id.* at 934-35. On immunity, this Court affirmed, holding that "Plaintiffs comfortably satisfy" the exception to state sovereign immunity for injunctive suits against state officials, and that legislative immunity is inapplicable. *Id.* at 930-34.

central to this litigation.  *E.g.*, Resp. Ex. 8  (Raffensperger press release discussing the Secretary's involvement in implementing the BMD system).[3]

### 1.     *Plaintiffs' attempts to gather information from other witnesses*

In 2022, the district court "defer[ed]" a decision on whether to allow plaintiffs to depose Secretary Raffensperger. Pet. Ex. 5 at 44:25.  The court explained that the question was premature because the parties did not yet know what other witnesses were "going to say" in their depositions and thus whether Secretary Raffensperger's testimony would be necessary to fill any gaps.  Pet. Ex. 5 at 44:18-45:4.  The court explained that a decision on his testimony should come "last," *i.e.*, after other witnesses had been deposed, and that the court would have to be "persuaded" at that time to require his testimony.  Pet. Ex. 5 at 44:19, 45:1.

Plaintiffs proceeded with  deposing other state witnesses pursuant to Rule 30(b)(6). Despite their obligation to educate themselves before providing testimony on behalf of the Secretary's Office, none of these witnesses indicated they contacted the Secretary for his knowledge on the noticed topics, and he apparently made no efforts to communicate his knowledge to these designees. Fed. R. Civ. P. 30(b)(6); *See,* Resp. Ex. 1 at 10:18-10:25 (Mr. Harvey spoke only with Counsel to prepare for

---

[3]     *See also* Ga. Sec'y of State, *About Secretary Raffensperger* https://sos.ga.gov/page/about-secretary-raffensperger (last visited Dec. 27, 2023) ("As Secretary of State, Raffensperger delivered the largest implementation of voting machines in the history of this country, on time and on budget.").

his 30(b)(6) deposition); Resp. Ex. 4 at 15:3-5 (same for Mr. Barnes); Resp. Ex. 2 at 14:16-15:14, 52:11-53:7, Resp. Ex. 3 at 397:8-397-11 (describing Mr. Beaver's efforts to prepare for his 30(b)(6) deposition, but does not name Secretary Raffensperger); Resp. Ex. 5 at 161:14-161:21 (same for Mr. Sterling); Resp. Ex. 12 at 13:23-15:9 (same).

Instead, witness after witness testified that only Secretary Raffensperger could speak to matters central to this case, including (i) the purported 2021 investigation into the Coffee County breaches; (ii) his own factual assertions on core issues; and (iii) his own decisions about what, if anything, the State is doing to maintain and secure its voting system.

For example, Plaintiffs attempted to question Michael Barnes, who "play[s] a major role in management of [Georgia's] electronic election system," (*Curling*, 2023 WL 7463462, at *6), about the state's examination (or non-examination) of voting equipment and servers, but he was unable to answer:

> Q:  Do you know why the Secretary's Office never performed any forensic examination of any of the DRE voting equipment or the – or the servers, the GEMS servers?
> Ms. LaROSS:  Objection to the form of the question.
> THE WITNESS:  No, sir, I do not.
> BY MR. CROSS:
> Q:  Who would make that decision on whether to conduct that type of examination?
> A:  I believe that would be a decision that would be made by the Secretary.
> Q:  Do you know if there was ever discussion or consideration of that type of examination of the old system?

A:  I do not know.

Resp. Ex. 4 at 33:6-33:21.  Barnes was likewise unable to explain why Secretary

Raffensperger had chosen not to have an election security expert evaluate Georgia's

system:

> Q.  But if you're confident that the system is secure, particularly in an environment now where there have been extraordinary claims made about the reliability of that system, why not just have an election security expert analyze it, examine it, and offer an opinion on whether it's reliable?
> MS. LaROSS:  I object to the form of the question.
> THE WITNESS:  I'm sure if the Secretary of State decided that he wanted to do that, that that would get done.
> BY MR. CROSS:
> Q.  And as you sit here, you don't know why he's not decided that; right?
> Ms. LaROSS:  I object to the form of the question.
> THE WITNESS:  I do not.

Resp. Ex. 4 at 296:20-297:11.

When plaintiffs questioned Sanford Merritt Beaver, "the Secretary of State's

Office Chief Information Officer with responsibility for election cybersecurity and

technology" (*Curling*, 2023 WL 7463462, at *19 n.31), about public statements the

Secretary's Office had made on its response to security vulnerabilities, he disclaimed

any knowledge:

> Q.  Okay. Did you – were you given an opportunity to review any of the public statements that the Secretary's office put out or any communications with the press about those incidence [sic] before those statements were made?
> A:  Not that I recognize – I mean, remember.  I mean, I focus on the IT infrastructure[.]  [P]ress releases and all that media kind of stuff is handled by the Secretary's front office.

Resp. Ex. 2 at 108:15-108:24; *see* Resp. Ex. 2 at 183:6-8 (Beaver testifying that by

"front office" he meant Secretary Raffensperger).   Beaver likewise testified that

Secretary Raffensperger was the decisionmaker on the Office's decision to replace

certain software with security vulnerabilities:

> Q:  When was the decision made to move away from E-Net?
> A:  Last year.
> Q:  Who made that decision?
> A:  Front office.
> Q:  And by front office who do you mean?
> A:  Secretary.
> Q:  Oh, Secretary Raffensperger?
> A:  Yes.  Those kind of decisions, it comes down to him to make the
> call.  We present proposals and it's up to him to say yay, nay.
> Q:  What –
> A:  It's a big decision.
> Q:  Sorry.
> A:  Yeah, that was a big, big decision.

Resp. Ex. 2 at 183:2-183:16.

Chris Harvey, the former director of elections in the Secretary's Office

(*Curling*, 2023 WL 7463462, at *3) was similarly unable to answer questions about

why the current BMD system was chosen, saying the question was best directed to

Secretary Raffensperger:

> Q:  Do you know why the Secretary's office picked a Q.R. code system
> rather than one that tabulates human readable text for the election system?
> A:  I don't.
> Q:  Who would you ask if you wanted to know the answer to that
> question?
> A:  Well, ultimately, the decision was made by the Secretary.  I know
> there was a committee that was evaluating the systems.  I was not part of that

11

committee.  I don't know if they offered recommendations or advice, but ultimately, it was the Secretary that made the decision.

Resp. Ex. 1 at 17:20-18:7; *see* Resp. Ex. 1 at 22:2-22:8 (Harvey testifying that he did not know why "the Secretary selected an election system that the sole cybersecurity advisor he put on his commission objected to").

 Gabriel Sterling, the chief operations officer for the Secretary's Office (*Curling*, 2023 WL 7463462, at *3), testified that he did not know whether Secretary Raffensperger had even read a report canvasing security vulnerabilities in Georgia's BMD system:

> Q.  So the Secretary himself has not read it?
> A.  I don't know.
> Q.  Well, you're testifying on behalf of the Secretary's office today as a corporate representative.  So I'm asking –
> A.  Yes, I am.
> Q.   I'm asking you as a corporate representative, has the Secretary himself read this report?
> A.  And my answer remains the same, that I don't know.
> Q.  Okay. And how would you find that out?
> A.  I guess I would probably have to call him and ask him.  It didn't occur to me to ask him beforehand.

Resp. Ex. 5 at 28:11-29:3.

### 2.    *Secretary Raffensperger's public statements*

Both before and after plaintiffs' attempts to secure key testimony through other witnesses Secretary Raffensperger made repeated public statements on specific factual matters central to this case.

For example, in January 2022, he stated that Dr. Halderman's expert report is

"not an objective, academic study by a non-biased actor" but rather contains "assertions by an individual who is paid to espouse opinions supporting the elimination of electronic voting systems to help a lawsuit brought by liberal activists;" he further dismissed the report as flawed because Dr. Halderman had "full access" to the Georgia Election system.[4]  In June 2023—after discovery in this case revealed that the Coffee County breaches gave Cyber Ninjas and others full access to the states election system—he still told the Georgia General Assembly that the risks identified in Dr. Halderman's report "are theoretical and imaginary." Secretary Brad Raffensperger, *Remarks to the General Assembly: Setting the Election Security Record Straight* (June 20, 2023), [https://sos.ga.gov/news/setting-election-security-record-straight.](https://sos.ga.gov/news/setting-election-security-record-straight.)

In the same address he castigated Plaintiffs while insisting Georgia's election systems were secure because there is "punishment for those who break our laws." *Id.* Only Secretary Raffensperger can explain these and other specific factual assertions about matters at the core of this case, *e.g.*:

- "The Halderman report was the result of a computer scientist having complete access to the Dominion equipment and software for three months in a laboratory environment."  *Id.*

---

[4] Ga. Sec'y of State Press Release, *Secretary Raffensperger Calls on J. Alex Halderman to Agree to Release "Secret Report" and Pre-Election Testimony* (Jan. 27, 2022), [https://sos.ga.gov/news/secretary-raffensperger-calls-j-alex-halderman-agree-release-secret-report-and-pre-election.](https://sos.ga.gov/news/secretary-raffensperger-calls-j-alex-halderman-agree-release-secret-report-and-pre-election)

- "We have layers of security protocols and procedures to physically protect ballots, the system, the software, and the results. We have tests and audits to verify results." *Id.*
- "It's more likely that I could win the lottery without buying a ticket" than that bad actors could install malware on all 35,000 pieces of equipment systems to change election outcomes. *Id.*

On December 6—the day before State Defendants moved to exclude Secretary Raffensperger's trial testimony as a "waste" of "time" (Pet. Ex. 7 at 10)—he again made specific factual statements about the purported security of Georgia's voting system. He "affirm[ed] the security and integrity of elections," including by having in place "practices such as testing all voting machines to ensure they are secure, conducting audits of ballots after every election to confirm the accuracy of the results, and storing paper ballots in secure facilities to maintain a paper trail."[5]

Secretary Raffensperger and his Office have also made contradictory statements concerning his Office's awareness and mitigation of the Coffee County breaches. As the district court observed, "[h]e initially stated that the Secretary of State's Office knew of the breach in January of 2021, but within minutes of so stating, an aide corrected the Secretary of State's response off camera and offered May of 2021 as the correct date." *Curling*, 2023 WL 7463462, at *26 n.45. Later, "a representative with the Secretary of State's Office clarified that the office did not

---

[5] Ga. Sec'y of State Press Release, *Secretary Raffensperger Joins Colleagues in Calling for Restored Trust in Electoral Systems* (Dec. 6, 2023), https://sos.ga.gov/news/secretary-raffensperger-joins-colleagues-calling-restored-trust-electoral-systems.

know about or began investigating Coffee County until July 2022." *Id.* (citation omitted). The Secretary, on one hand, commented that "the individuals the Secretary of State's investigators had interviewed had not been truthful," potentially resulting in Chief Operating Officer Gabriel Sterling's April 2022 statement that the Coffee County breach simply "didn't happen." *Id.* at *26. Yet Secretary Raffensperger "simultaneously maintained that the Secretary's Office learned about the breach early on and had been continuing to investigate the matter." *Id.*[6]

Contradictory statements from the Secretary and his official representatives have not been limited to the Coffee County breaches. For example, when asked by the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol if there was any way the voting machines could be hacked, he stated flatly, "[t]hey haven't been" while explaining "[t]he machines are secured" because there is security tape that if broken would reveal any breach and testified that "there was never any evidence of that." Resp. Ex. 7 at 59-60. But the Secretary's Office by that time was aware of evidence that the seals on multiple BMDs had been violated during the election, and that these machines had nonetheless been used on Election Day. *E.g.*, Resp. Ex. 9 (Nov. 5, 2020 Email to C. Harvey (Secretary of State's Elections Director) reporting voting machines with broken seals and missing zip ties

---

[6] Ryan Germany also identified mid-March 2022 as the start date for an investigation into the Coffee County breaches. Resp. Ex. 6 at ¶21.

in Fulton County); Resp. Ex. 10 (Nov. 10, 2020 email from C. Harvey discussing photographs showing broken seals on BMDs in Hartwell, GA).  The Secretary's 30(b)(6) representative was unable to say what if any follow up actions were taken from these reports. Resp. Ex. 1.1 at 50:9-50:15; 62:16-62:20.

### 3.    *Trial subpoena*

Unable to gather critical information about core matters at issue in their case—and repeatedly told by state witnesses that only Secretary Raffensperger could provide it—Plaintiffs issued him a trial subpoena.  Pet. Ex. 6.  State Defendants asked for an order precluding the Secretary's testimony, on the ground that he was a high-ranking official whose testimony would be "cumulative."  Pet. Ex. 7 at 10.

At a hearing to consider the State Defendants' request, the district court noted that it had "spared [Secretary Raffensperger] for a significant period of time when it was not necessary to have him as a witness."  Pet. Ex. 1 at 122: 21-123:1.  But the court noted that "nothing else is going to replace" his testimony as "a central figure in this case" and thus denied the motion.  Pet. Ex. 1 at 123:1, 128:4.  But the court emphasized that it would "put time limits on" his testimony "to make sure that it is not abusive."  Pet. Ex. 1 at 122:21-123:1.

The court then issued a written order memorializing its decision.  Pet. Ex. 9 at 5.  The court recognized that to call the Secretary as a witness Plaintiffs had to "show a special need or situation compelling such testimony."  Pet. Ex. 9 at 3

(quoting *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993)).  But it noted that a party can demonstrate such a special need when it shows that the high ranking official has "'direct personal factual information pertaining to material issues' and that the information 'is not available from any other sources, such as lower-level officials.'"  Pet. Ex. 9 at 3 (quoting *Fair Fight Action, Inc. v. Raffensperger*, 333 F.R.D. 689, 693, 696-697 (N.D. Ga. 2019)).  The special need showing is also satisfied "where the high-level official is personally involved in the implementation or oversight of a challenged law or policy."  Pet. Ex. 9 at 3-4 (citing *Atl. J & Const. v. City of Atl. Dep't of Aviation*, 175 F.R.D. 347, 348 (N.D. Ga. 1997) & *Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 413 (N.D. Ala. 2017)).

The court concluded that Plaintiffs had shown a special need here.  It noted that Secretary Raffensperger had made "numerous statements" on specific factual matters at the core of this case, including "Dr. Halderman and his findings, the Coffee County data system breach, and the resulting implications for the security of the election system in Georgia."  Pet. Ex. 9 at 4.  And some of these statements were "inconsistent with other public statements from the Secretary of State's Office about when the[] State knew of the Coffee County breach and the steps it took to investigate the breach."  Pet. Ex. 9 at 4.  The Secretary had also made statements about "the steps the State has taken to ensure the security of the voting system."  Pet. Ex. 9 at 4.  The district court found that all these statements "make clear that the

17

Secretary—as the final decision maker and head of the department—has direct personal factual information pertaining to material issues." Pet. Ex. 9 at 4. And the court found that "testimony surrounding the Secretary's statements and final decisions cannot be obtained from lower-level officials." Pet. Ex. 9 at 4-5. The court relied in particular on the fact that State Defendants' Rule 30(b)(6) witnesses had "indicate[d] that the Secretary was directly involved and was the final decision maker concerning specific issues of election security." Pet. Ex. 9 at 5 (citing Barnes testimony).

At the same time, the court recognized that "the Secretary has 'greater duties and time constraints than other witnesses." Pet. Ex. 9 at 5 (quoting *In re United States*, 985 F.2d at 512). It thus limited plaintiffs' direct examination to 75 minutes "absent serious reason to extend this timeframe." Pet. Ex. 9 at 5. It also said it would allow only one plaintiffs' counsel to conduct the examination—leaving one of the two plaintiffs groups in this case, who each maintain separate counsel, unable to directly question the Secretary at all. Pet. Ex. 9 at 5. The court said it would "determine the length of any re-direct permissible after hearing what, if any testimony, defense counsel elicits from the Secretary." Pet. Ex. 9 at 5.

### 4. *Subsequent developments*

On December 21, Secretary Raffensperger filed this mandamus petition, asking the Court to vacate its order compelling the Secretary to testify at trial, which

18

will start on January 9. On December 22, he asked the district court for a stay of its order directing him to testify pending this Court's decision on the mandamus petition. ECF No. 1751. On December 26, Plaintiffs filed a notice of non-opposition to the stay request, explaining that given this Court's expedited briefing schedule all parties expected a decision on the mandamus petition before the start of trial on January 9. ECF No. 1752.

## STANDARD OF REVIEW

A district court "has broad discretion in the management of the trial," and this Court "will not reverse a judgment based on the court's trial management rulings 'absent a clear showing of abuse.'" *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1408 (11th Cir. 2011) (citation omitted). "[T]he deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous. Thus, it is by now axiomatic that a district court enjoys considerable leeway in making these determinations." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (citations & quotation marks omitted).

Because the Secretary "has petitioned for mandamus" the standard he must satisfy is "even more stringent." *In re Moody*, 755 F.3d 891, 898 (11th Cir. 2014). "[M]andamus is an extraordinary remedy, which is available only to correct a clear abuse of discretion or usurpation of judicial power." *In re Lopez-Lukis*, 113 F.3d

1187, 1187-88 (11th Cir. 1997). "[A] party is not entitled to mandamus merely because it shows evidence that, on appeal, would warrant reversal of the district court." *In re BellSouth Corp.*, 334 F.3d 941, 953 (11th Cir. 2003). Rather, "[t]he party seeking mandamus has the burden of demonstrating that its right to issuance of the writ is clear and indisputable." *Id.* (quotation marks omitted).

## ARGUMENT

Secretary Raffensperger's testimony is central to critical factual matters that will be adjudicated at the upcoming trial, and there is no substitute for it. The district court acted well within its broad trial management discretion in requiring his testimony (while placing significant time constraints on it), and State Defendants fall well short of satisfying the demanding standard required for mandamus relief. The petition should be denied.

### A.    Plaintiffs Established A "Special Need" for Secretary Raffensperger's Testimony

"[I]n the Eleventh Circuit, there is no per se rule forbidding the deposition of high-ranking government officials." *Fair Fight*, 333 F.R.D. at 692 (quoting *Davis ex rel. J.D.D. v. Carroll*, No. 8:16-CV-0998-T-35MAP, 2017 WL 11151858, at *2 (M.D. Fla. July 24, 2017)). But this Court requires parties seeking such testimony to "show a special need or situation compelling" it. *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993). When the same testimony is "available from alternate witnesses," the standard may not be satisfied. *Id.* But the flip-side is also true: "[t]he

20

exceptional circumstances requirement is considered met 'when high-ranking officials have direct personal factual information pertaining to material issues in an action' and the 'information to be gained is not available from any other sources,' such as lower-level officials." *Fair Fight*, 333 F.R.D. at 693 (quoting *McDaniel v. Bradshaw*, No. 10-81082-CIV, 2011 WL 13150501, at *1 (S.D. Fla. May 23, 2011), *on reconsideration*, No. 10-81082-CIV, 2011 WL 13150486 (S.D. Fla. June 8, 2011)) (some quotation marks omitted).

*In re United States* and *Fair Fight* show how this standard is applied. In *In re United States*, this Court granted mandamus to quash a subpoena issued by two criminal defendants that would have required testimony from Dr. David Kessler, commissioner of the federal Food & Drug Administration. 985 F.2d at 511-512. The defendants wanted Dr. Kessler's testimony to show that the FDA had "failed to prosecute others similarly situated" to them. *Id.* at 511. The Court found his testimony unnecessary: Dr. Kessler was not even the commissioner at the time the FDA investigated the defendants' case, and two other officials had already testified on the subject at a hearing on defendants' motion to dismiss. *Id.* at 512-513; *see In re USA*, 624 F.3d 1368, 1373 (11th Cir. 2010) (testimony of Administrator of Environmental Protection Agency unnecessary where government had offered testimony of Assistant Administrator, who was the "most knowledgeable official" about the relevant issue).

21

In *Fair Fight*, by contrast, the district court ordered testimony from Georgia Governor Brian Kemp regarding subjects on which he had firsthand knowledge from his time as Georgia Secretary of State. 333 F.R.D. at 698.[7]  For example, plaintiffs sought information on his "interpretation" of the duties of the State Election Board (which he chaired when Secretary of State) and how that interpretation "informed his actions or inaction as Chair." *Id.* at 695.  More specifically, plaintiffs "questioned why certain counties were not sanctioned for violations of the voting laws addressed in [State Election Board] complaints." *Id.*  The court concluded that Governor Kemp had to testify on these subjects because it was "clear from the testimony of the other three [State Election Board] members that they [did] not have answers to such questions." *Id.*  The court likewise found his testimony necessary on the State Election Board's "failure to timely investigate complaints," a subject material to the

---

[7] Other district courts in this circuit have likewise applied the special needs test from *In re United States* to find testimony by high-ranking officials necessary. *See, e.g.*, *Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 413 (N.D. Ala. 2017) (permitting deposition of Alabama Secretary of State in a case challenging voter identification law "because he has been personally involved in implementing the law" and made "numerous public statements regarding its rationale and effects"); *Celentano v. Nocco*, No. 8:15-cv-1461-T-30AAS, 2016 WL 4943939, at *2-*3 (M.D. Fla. Sept. 16, 2016) (ordering sheriff to testify in employment discrimination case because another witness testified that sheriff was the "final decision maker with respect to the decision to terminate Plaintiff's employment" and sheriff thus had "some unique knowledge pertinent to the issues in the case"); *Atl. J. & Const. v. City of Atl. Dep't of Aviation*, 175 F.R.D. 347, 347-48 (N.D. Ga. 1997) (ordering testimony from Atlanta mayor because he was "likely to possess pertinent, admissible, discoverable information which can be obtained only from him").

plaintiffs' claims. *Id.* at 697. "Nothing in the 30(b)(6) testimony [spoke] to these precise questions," and only "then-Secretary Kemp [could] explain why he decided to call (or forgo) meetings when he did, and why he chose to schedule certain items of discussion when he did." *Id.* Finally, the court found Governor Kemp's testimony required on a public statement relevant to the case because only he could "explain what he actually meant when he made the statement." *Id.* at 696.[8]

The case for Secretary Raffensperger's testimony here is even stronger than was the case for Governor Kemp's testimony in *Fair Fight*. Here, witness after witness testified that they were unable to provide information on key questions and said that only Secretary Raffensperger could do so. *See* pp. 8-12, *supra*. For example, Michael Barnes testified that he did not know why there had been no forensic examination of DRE voting equipment or evaluation of Georgia's voting system by an election security expert and that those were decisions made by Secretary Raffensperger. *See* pp. 9-10, *supra*; *see also Curling*, 2023 WL 7463462,

---

[8] State defendants have contended that the *Fair Fight* court required Governor Kemp's testimony only because "the very specific issue there were allegations related to campaign speech that the plaintiffs insisted were evidence of intentional discrimination for purposes of their 15th Amendment claim." Pet. Ex. 2 at 124. But as the summary above shows, the testimony was not limited to "campaign speech"; it extended to the operations of the State Election Board and decisions that Governor Kemp made while chairing it. And the court's analysis did not turn at all on the intent necessary to establish a 15th Amendment claim; instead, the driving "issue" was whether Governor Kemp could "supply the information sought or stated another way, whether the information sought is personal and unique to the Governor." *Fair Fight*, 333 F.R.D. at 693.

at *5-*9 (district court summary judgment order canvassing "the vulnerabilities of the previous DRE system (and why they are still relevant)" including using data from the old ENET system to authenticate voters) (capitalization altered); Resp. Ex. 14 (Barnes directing county officials to reuse USB drives from the DRE system with BMDs).

Chris Harvey said he did not know why the Secretary's Office chose a voting system that tabulates votes based on a QR code rather than human readable text—a decision at the heart of plaintiffs' claims—and that "the decision was made by the Secretary." *See* pp. 11-12, *supra*; *see also Curling*, 2023 WL 7463462, at *5 (observing that "the QR barcodes used to tabulate votes" is a "central concern[]" in this case); *id.* at *12-*13 (canvassing "concerns regarding QR code vulnerability to alteration") (capitalization altered).

Gabriel Sterling said he did not know whether Secretary Raffensperger had even read a key report showing the vulnerabilities in Georgia's voting system and that the only way to find out would be "to call him and ask him." *See* p. 12, *supra*; *see also Curling*, 2023 WL 7463462, at *37 (noting that the Department of Homeland Security's Cybersecurity & Infrastructure Security Agency "corroborated many of the vulnerabilities identified in the Halderman Report, and indicated that these vulnerabilities should be mitigated as soon as possible" but that "[t]here is currently no evidence that the State has taken action to implement CISA's

recommended mitigation steps or otherwise responded to the vulnerabilities identified by Dr. Halderman").

Secretary Raffensperger is also the only witness who can testify about what he meant when he made public and highly specific factual assertions about matters central to this case. *See Fair Fight*, 333 F.R.D. at 696 (governor ordered to testify because only he could "explain what he actually meant when he made the statement"). For example, why does Secretary Raffensperger believe that the vulnerabilities identified in Dr. Halderman's report are merely "theoretical and imaginary"? *See* p. 13, *supra*. What are the "layers of security protocols and procedures" he believes "physically protect ballots, the system, the software, and the results" and what are the "tests and audits to verify [the] results"? *See* p. 14, *supra*. Why did he tell Congress there was "no evidence" that any BMDs security seals were violated despite numerous reports to the contrary? *See* pp. 15-16, *supra*. When did the Secretary's Office learn of (and begin responding to) the Coffee County breaches? The Secretary and his representatives have at various times stated their investigation began: (i) "early on" in 2021 before April of that year, (ii) during the summer of 2021 when his Office replaced some of the voting equipment in Coffee County, and (iii) in the spring or summer of 2022 after Plaintiffs brought the Coffee County breaches to light through their own discovery efforts. *See* pp. 14-15, *supra*. Which is it?

25

In sum, Secretary Raffensperger's testimony on numerous issues at the heart of this case is indispensable. On many key issues, his own staff, including Rule 30(b)(6) witnesses speaking on behalf of his Office, have testified that he is the only witness who can provide the needed testimony. The district court thus correctly ordered him to do so, while putting significant time limits on his testimony in recognition of his position.

### B. The Secretary's Objections To The District Court's Order Lack Merit

The Secretary makes several arguments against being required to testify at trial. None has merit, much less establishes the "clear and indisputable" entitlement to relief required for mandamus. *In re BellSouth Corp.*, 334 F.3d at 953.

The Secretary remarkably claims that Plaintiffs "have not identified any essential information uniquely in the Secretary's possession that could not be addressed" by other witnesses. Pet. 15. That is manifestly wrong. As discussed above, defendants' *own witnesses* identified essential information on a variety of topics that was uniquely in Secretary Raffensperger's possession, and they testified that they could not address it. Plaintiffs made this same showing before the district court. *See* Pet. Ex. 8 at 17-19 & n.11; *cf.* Pet. 7 (wrongly contending that "Plaintiffs did not identify any specific items which they believed to be uniquely in the Secretary's personal knowledge"). And the district court relied on that showing in ordering Secretary Raffensperger to testify. Pet. Ex. 9 at 4-5 (pointing to Plaintiffs'

26

"evidence" that testimony about the Secretary's "final decisions cannot be obtained from lower-level officials" and pointing to the example of Barnes' testimony "that decision of whether to conduct a forensic exam of old system would be made by the Secretary and Barnes was unaware if such an exam was ever considered"). The Secretary offers no response at all to this central basis for the district court's decision. That is reason by itself to deny his petition.

The Secretary next contends that the district court ordered him to testify merely "because he made public statements about the general subject matter of the lawsuit." Pet. 4. As just discussed, that is wrong: the district court found that Secretary Raffensperger possesses indispensable factual information that "cannot be obtained" from other witnesses. Pet. Ex. 9 at 5. And in any event the Secretary's characterization of the statements is also incorrect. As the description above plainly shows, *see supra* pp. 12-16, these were not mere "public statements about subject matters squarely within [Secretary Raffensperger's] portfolio." Pet. 22. He made many very specific factual assertions about matters at the heart of this case. As the district court found, these statements involved, among other things, "Dr. Halderman and his findings, the Coffee County data system breach, and the resulting implications for the security of the election system in Georgia." Pet. Ex. 9 at 4. As the district court found, those statements "make clear" that the Secretary possesses "direct personal factual information pertaining to material issues." Pet. Ex. 9 at 4.

27

And some of those statements "are inconsistent with other public statements from the Secretary of State's Office." Pet. Ex. 9 at 4. Secretary Raffensperger's testimony is the only way to resolve the contradiction.

The Secretary's reliance on *In re Paxton*, 60 F.4th 252 (5th Cir. 2023), fails for similar reasons. To start, the Fifth Circuit's lead basis for granting mandamus has no relevance here: the district court there had failed to discharge its "non-discretionary duty" to address a pending motion to dismiss for lack of subject matter jurisdiction before ordering the Texas attorney general to testify about his office's authority to enforce the state's abortion laws. *Id.* at 257-258. The Fifth Circuit went on to also conclude that the district abused its discretion in not quashing the subpoena. *Id.* at 258. But that was because the district court had "conceded the 'plain fact that lawyers at the Attorney General's Office may articulate the Office's [enforcement] policies.'" *Id.* (brackets in original). So the Attorney General's testimony was not necessary: "by the [district] court's own admission, if there is a need to clarify the office's enforcement policy, a representative can do so on the Attorney General's behalf." *Id.* The Attorney General's public statements about the subject of the litigation changed nothing: his "'thoughts and statements' ha[d] no bearing on his office's legal authority to enforce Texas's abortion laws or any other law." *Id.*

28

The situation here is completely different.  The district court has most definitely *not* "conceded" that other witnesses could provide the relevant testimony—it found the opposite.  *See* Pet. Ex. 9 at 4-5 (pointing to Plaintiffs' "evidence" that testimony about the Secretary's "final decisions cannot be obtained from lower-level officials").  Nor does this case involve a mere question of "legal authority" on which the Secretary's views are irrelevant.  Instead, there are a series of *factual* matters on which the Secretary alone can testify: for example, resolving the conflict between his own statements and those of others in his Office regarding his Office's investigation of the Coffee County breaches, his own decision not to order a forensic examination of the state's voting system after it was breached, and the security protocols he personally claims safeguard the system from intrusion. [9]

---

[9] Other out-of-circuit authority cited by the Secretary is likewise inapposite because it involved cases where, unlike here, the needed information was available from other sources.  *See, e.g.*, *Bogan v. City of Boston*, 489 F.3d 417, 423-24 (1st Cir. 2017) (plaintiffs "did not pursue other sources to obtain relevant information before turning to the Mayor"); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 587 (D.C. Cir. 1985) ("Simplex has not suggested any information in the possession of these officials (regarding general enforcement proceedings) that it could not obtain from published reports and available agency documents.").  In *U.S Bd. of Parole v. Merhige*, 487 F.2d 25 (4th Cir. 1973), the discovery sought from the government officials was not even relevant because the case "raise[d] only questions of law and [the court of appeals] fail[ed] to see any necessity for extensive evidentiary development." *Id.* at 28.  *In re University of Michigan*, 936 F.3d 460 (6th Cir. 2019), involved an issue not relevant here:  a court's authority to mandate an official's attendance at a settlement conference.  *Id.* at 464 (discussing Fed. R. Civ. Proc. 16).

Finally, the Secretary insinuates that Plaintiffs should be barred from calling him to testify at trial because they did not depose him.  Pet. 1, 20-21.  Of course, Secretary Raffensperger vigorously objected to any such deposition when Plaintiffs first raised the possibility, *see* Pet. Ex. 3,  and the district court deferred deciding on Secretary Raffensperger's testimony until Plaintiffs had the chance to secure relevant information from other witnesses. Pet. Ex. 5 at 44:25.  Plaintiffs endeavored to do so, only to be told over and over again by witnesses from the Secretary's Office that only the Secretary could answer their questions.  He had ample opportunity to convey his knowledge and views to the  witnesses designated to testify on his behalf under Rule 30(b)(6) (including several who testified multiple times, some several months apart), but the Secretary elected not to educate them.  Plaintiffs should not now be penalized for their diligent but ultimately unsuccessful efforts to establish critical facts without Secretary Raffensperger's testimony.

Most fundamentally, the Secretary cites no authority for the proposition that a deposition is a mandatory prerequisite before a plaintiff may call a named defendant as a witness at trial.  Nor would that make sense in this context where the aim is to minimize the burden on high-ranking officials.  If such officials could be called to testify at trial only after being deposed as the Secretary seems to argue, such a novel rule necessarily would subject high-ranking officials to multiple

examinations.  Here, Plaintiffs seek to examine the Secretary only at trial, having saved him from the burden of a deposition as well.

* * *

Secretary Raffensperger's representatives have repeatedly deferred to him personally on questions central to this case.  He has simultaneously made numerous public comments about the same factual issues. The district court acted well within its broad discretion when ordering that he should be subject to the "ultimate fact-check" of testimony at trial.[10]

## CONCLUSION

The petition should be denied.

---

[10] Brad Raffensperger, *Integrity Counts* 143 (2021).

31

Dated: December 29, 2023

Respectfully submitted,

/s/ Joseph R. Palmore

Bruce P. Brown
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
Tel: (404) 386-6856
bbrown@brucepbrownlaw.com

JOSEPH R. PALMORE
DAVID D. CROSS
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C. 20037
Telephone:  (202) 887-6940
JPalmore@mofo.com

*Counsel for Respondents Coalition for
Good Governance, William Digges III,
Laura Digges, & Megan Missett*

HALSEY G. KNAPP, JR.
ADAM M. SPARKS
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Respondents Donna
    Curling, Donna Price, & Jeffrey
    Schoenberg*

# EXHIBITS

**IN RE: SECRETARY, STATE OF GEORGIA – No. 23-14115 (11th Cir.)**
**EXHIBITS TABLE OF CONTENTS**

| No. | Date | Dkt. No. | Description |
|---|---|---|---|
| 1 | 04/13/2022 | 1368-1 | Excerpts from Deposition of Chris Harvey on Jan. 28, 2022 |
| 1.1 | | 1634-54 | Unredacted Excerpts from Deposition of Chris Harvey on Jan. 28, 2022 |
| 2 | 04/13/2022 | 1368-2 | Excerpts from Deposition of Sanford Merritt Beaver on Feb. 2, 2022 |
| 3 | 04/13/2022 | 1368-3 | Excerpts from Deposition of Sanford Merritt Beaver on Mar. 10, 2022 |
| 4 | 04/13/2022 | 1368-4 | Excerpts from Deposition of Michael Barnes on Feb. 11, 2022 |
| 5 | 04/13/2022 | 1368-5 | Excerpts from Deposition of Gabriel Sterling on Feb 24. 2022 |
| 6 | 08/02/2022 | 1444-1 | Ex. A to State Defendants' Reply Re Investigative Privilege |
| 7 | 02/13/2023 | 1630-27 | Ex. 77 to Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment |
| 8 | 02/13/2023 | 1630-28 | Ex. 78 to Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment |
| 9 | 02/14/2023 | 1632-10 | Ex. 160 to Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment |
| 10 | 02/14/2023 | 1632-12 | Ex. 162 to Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment |
| 11 | 02/16/2023 | 1637 | Excerpts from Plaintiffs' Corrected Joint Statement of Additional Facts in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment |
| 12 | 02/21/2023 | 1645 | Excerpts from Deposition of Robert Gabriel Sterling on Oct. 12, 2022 |
| 13 | 06/14/2023 | 1681 | Excerpts from the Corrected Version of the Expert Report of Dr. J. Alex Halderman |
| 14 | | 892-11 | PX 37 – Email Correspondence |

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,          )
                                )
        Plaintiffs,             )
                                )
vs.                             )          CIVIL ACTION NO.
                                )
BRAD RAFFENSPERGER, ET          )          1:17-CV-2989-AT
AL,                             )
                                )
        Defendants.             )


VIDEOTAPED 30(b)(6) DEPOSITION OF OFFICE OF THE
SECRETARY OF STATE
(through William "Chris" Harvey)

(Taken by the Curling Plaintiffs)

January 28, 2022

8:40 a.m.


Reported by:   Debra M. Druzisky, CCR-B-1848

Page 2

```
 1                   APPEARANCES OF COUNSEL

 2   On behalf of the Curling Plaintiffs:

 3       DAVID D. CROSS, Esq.
         HANNAH ELSON, Esq.
 4       JENNA CONAWAY, Esq.
         LOGAN WREN, Esq.
 5       SONJA SWANBECK, Esq.
         REEMA SHOCAIR ALI, Esq.
 6       Morrison & Foerster
         2100 L Street NW, Suite 900
 7       Washington, D.C.  20037
         (202) 887-8795
 8       dcross@mofo.com
         helson@mofo.com
 9       jconaway@mofo.com
         lwren@mofo.com
10       sswanbeck@mofo.com
         rali@mofo.com

11

12   On behalf of the Coalition Plaintiffs:

13       CARY ICHTER, Esq.
         JILL CONNORS, Esq.
14       Ichter Davis
         3340 Peachtree Road, Suuite 1530
15       Atlanta, Georgia  30326
         cichter@ichterdavis.com
16       jconnors@ichterdavis.com

17
     On behalf of the Defendants Georgia Secretary of
18   State and State Election Board:

19       VINCENT R. RUSSO, Esq.
         CAREY MILLER, Esq.
20       Robbins Ross Alloy Belinfante Littlefield
         500 14th Street
21       Atlanta, Georgia  30318
         (678) 701-9381
22       vrusso@robbinsfirm.com
         carey.miller@robbinsfirm.com

23

24

25
```

Page 3

1           APPEARANCES OF COUNSEL (Continued.)

2    On behalf of the Defendant Fulton County Voter
     Registration and Elections:
3
         DAVID LOWMAN, Esq.
4        Office of the Fulton County Attorney
         141 Pryor Street, Suite 4038
5        Atlanta, Georgia  30303
         (404) 612-4000
6        david.lowman@fultoncountyga.gov

7
     Also Present:
8
         Krishan Patel, videographer
9        Susan Greenhalgh
         Marilyn R. Marks
10
                       --oOo--
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                    INDEX TO EXAMINATION

 2     Witness Name:                              Page

 3     WILLIAM "CHRIS" HARVEY

 4        By Mr. Cross                               8

 5        By Mr. Ichter                           223

 6

 7

 8

 9              INDEX TO PLAINTIFF'S EXHIBITS

10       No.             Description            Page

11     Exhibit 1    1-26-22, Curling Plaintiffs'    9
                    Second Amended Notice of
12                  Deposition of Office of the
                    Secretary of State re: The
13                  above-captioned action.

14     Exhibit 2    LinkedIn profile re: Chris     35
                    Harvey.
15
       Exhibit 3    (Exhibit not identified by
16                  counsel.)

17     Exhibit 4    State Defendants 101460 thru   44
                    461, 11-6-20, E-mail string from
18                  Chris Harvey to Frances Watson
                    re: Violation.
19
       Exhibit 5    State Defendants 101471 thru   61
20                  473, 11-10-20, E-mail string
                    from Chris Harvey to Frances
21                  Watson re: Security seals on
                    B.M.D.s.
22
       Exhibit 6    State Defendants 108321,       56
23                  10-10-20, E-mail from David
                    Worley to Chris Harvey re: Hall
24                  County.

25
```

Page 8

```
 1              THE VIDEOGRAPHER:  Today's date is
 2         January 28th, 2022, and the time is 8:39
 3         a.m.  This will be the remote videotaped
 4         deposition of Chris Harvey.
 5              Would counsel please introduce
 6         themselves and any objection to the
 7         witness being sworn in remotely.
 8              MR. CROSS:  This is David Cross on
 9         behalf of Curling plaintiffs.
10              MR. ICHTER:  This is Cary Ichter on
11         behalf of the Coalition plaintiffs.
12              MR. RUSSO:  This is Vincent Russo on
13         behalf of the State defendants.
14              MR. LOWMAN:  This is David Lowman on
15         behalf of Fulton County defendants.
16              THE VIDEOGRAPHER:  Would the court
17         reporter please swear in the witness?
18                  WILLIAM "CHRIS" HARVEY,
19    having been first duly sworn, was examined and
20    testified as follows:
21                        EXAMINATION
22    BY MR. CROSS:
23         Q.   Morning, Mr. Harvey.
24         A.   Good morning.
25         Q.   Can you hear me okay?
```

Page 9

1      A.   I can.

2      Q.   Do you understand that you are testifying

3  on behalf of the Secretary of State's office today

4  on a couple of specific topics?

5      A.   I do, on a couple specific topics.

6      Q.   All right.  And do you understand that

7  that means that you're testifying to the

8  Secretary's office's knowledge of information on

9  those particular topics?

10     A.   Yes.

11     Q.   All right.

12                     (Whereupon, Plaintiff's

13                     Exhibit 1 was marked for

14                     identification.)

15  BY MR. CROSS:

16     Q.   So let me, since you don't have Exhibit

17  Share, tell me if you can see what's on the screen

18  now.  It should be Exhibit 1.

19     A.   I can, yes.

20     Q.   Okay.  And you see that this is our second

21  amended notice of deposition of the Office of the

22  Secretary of State?

23     A.   Yes.

24     Q.   Have you seen this document before?

25     A.   I don't believe so.

Page 10

 1      Q.   Okay.  So let me jump to the topics.  And

 2   you were designated on two topics, topics 12 and

 3   18.  Do you see topic 12 up here?

 4      A.   I do.

 5      Q.   And it's:

 6           "Communications with the U.S.

 7        Election Assistance Commission

 8        regarding any software changes

 9        involving Georgia's current election

10        system or otherwise relating to any

11        actual or contemplated request for

12        E.A.C. approval for any aspect of

13        Georgia's current election system."

14           And am I right that you're designated to

15   testify on behalf of the Secretary's office on that

16   topic today?

17      A.   That's correct.

18      Q.   What did you do to prepare yourself to

19   testify on that topic?

20      A.   I spoke with counsel and just went through

21   my memory and recollection about communications

22   with the E.A.C.

23      Q.   Did you speak with anyone other than

24   counsel for this topic?

25      A.   No.

Page 17

1    hand-marked paper ballots, for example, as a

2    primary means of voting?

3        A.   Again, when I -- when I left the Secretary

4    of State's office earlier this year, I was not

5    aware of any discussions.  I'm not aware of any

6    discussions since then.

7        Q.   Okay.  If you wanted to know whether there

8    have been consideration or discussions at the

9    Secretary's office about potential changes to the

10   current B.M.D. system, who would you ask?

11       A.   I'd probably ask either Blake Evans, who's

12   the current election director, or possibly Gabriel

13   Sterling in the office also.

14       Q.   And Blake Evans took over in your position

15   after you left; is that right?

16       A.   That's correct.

17       Q.   Did he report to you before you left?

18       A.   He did.  He was the deputy when I was the

19   director.

20       Q.   Do you know why the Secretary's office

21   picked a Q.R. code system rather than one that

22   tabulates human readable text for the election

23   system?

24       A.   I don't.

25       Q.   Who would you ask if you wanted to know

Page 18

1    the answer to that question?

2         A.   Well, ultimately, the decision was made by

3    the Secretary.  I know there was a committee that

4    was evaluating the systems.  I was not part of that

5    committee.  I don't know if they offered

6    recommendations or advice, but ultimately, it was

7    the Secretary that made the decision.

8         Q.   So if you wanted to understand why and how

9    that decision was made, is the Secretary the person

10   you would turn to for that?

11        A.   For an ultimate answer, yes.  But I

12   suspect that the members of his, you know, close

13   advisors would have been part of that process.

14   Ryan Germany, Gabriel Sterling, Jordan Fuchs

15   probably -- I suspect had conversations.  I didn't

16   have any conversations with them about that.

17        Q.   Did anyone in the Secretary's office ever

18   raise a concern about using Q.R. codes rather than

19   human readable text to tabulate ballots?

20        A.   Did anyone in the -- so member within the

21   Secretary of State's office?

22        Q.   Yes.

23        A.   Okay.  I don't believe so.  I know in

24   the -- when, actually, when -- before even

25   Secretary Raffensperger took office, when we had

Page 19

1     started with the S.A.F.E. Commission, there were

2     discussions with the S.A.F.E. Commission in the

3     office about different kinds of systems and pros

4     and cons.  But I don't believe anyone in the

5     Secretary's office raised objections once the

6     system was decided on.

7         Q.    Were there concerns raised on that issue

8     before that system was decided on in the

9     Secretary's office?

10        A.    Like I said, there were discussions about

11    it.  There were, you know, pros and cons.  There

12    were pros and cons of hand-marked versus B.M.D.s

13    versus D.R.E.s.  So people spoke about, like I

14    said, the pros and cons of the system.

15            So I, I believe that, you know, somebody

16    would have, you know, raised a question or said,

17    hey, with this you get this, but you also get that.

18    But I can't think of any specific persistent

19    objections that came about a Q.R. code.

20        Q.    What were the cons that came up in any

21    discussion regarding the current system?

22            MR. RUSSO:  Object to form.

23            THE WITNESS:  I think with the

24        current system -- again, are we talking

25        before the decision on the current system

Case 1:17-cv-02989-AT   Document 1368-1   Filed 04/13/22   Page 20 of 286
USCA11 Case: 23-14115   Document: 19   Date Filed: 12/29/2023   Page: 52 of 175

Page 20

1          or since the current system?

2     BY MR. CROSS:

3          Q.    Either.  At any point that it's been

4     discussed in the Secretary's office.

5          A.    Well, I think that the one -- one of the

6     issues about the system is that it's sort of, in a

7     word, it's sort of bulky.  You've got, you know,

8     multiple components.  You've got wires.  You've

9     got -- it takes up a fair amount of space.

10          I don't think there was any concern with

11     the -- with the way it operated.  I think people

12     liked its operation and its user friendliness and

13     things like that.

14          But it seems like the most common

15     objection or issue we had to work around was the

16     fact that it had, you know, what, five or six

17     different pieces to it for every voting station.

18          We had maybe three or four, not -- maybe

19     not five or six.  But you had the B.M.D.  You had

20     the printer.  You had the external power source.

21     You had cables connecting that stuff.  You had

22     boxes to transport it back and forth in,

23     safekeeping storage.  Those kinds of things were

24     sort of concerns or issues we had to work around.

25          Q.    You mentioned the S.A.F.E. Commission a

Page 21

1    moment ago.  Are you familiar with Wenke Lee, who

2    was the only cybersecurity expert who served on

3    that commission?

4         A.   I'm familiar with him.  I don't, certainly

5    don't know him personally.  But I spoke with him

6    and heard him speak at S.A.F.E. Commission

7    meetings.

8         Q.   And do you recall that Wenke Lee objected

9    to the State adopting a B.M.D. system?

10        A.   I --

11             MR. RUSSO:  Object to form.  Object,

12        excuse me, object to the form of the

13        question.  Lacks foundation.

14             THE WITNESS:  I do remember.

15   BY MR. CROSS:

16        Q.   Okay.  In fact, he was vocal in saying

17   that hand-marked paper ballots as a primary voting

18   system would be the best, safest system for the

19   State; right?

20             MR. RUSSO:  Object to form.

21             THE WITNESS:  I believe that's

22        correct.  I know he -- I don't remember

23        exactly what his position was on

24        everything, but I know that he was a

25        proponent of hand-marked paper ballots.

Page 22

```
 1    BY MR. CROSS:

 2        Q.   Do you know why the Secretary selected an

 3    election system that the sole cybersecurity advisor

 4    he put on his commission objected to?

 5            MR. RUSSO:  Object to the form of the

 6        question.

 7            THE WITNESS:  I don't know why the

 8        Secretary chose that voting system.

 9    BY MR. CROSS:

10        Q.   Who would you ask if you wanted to know

11    why the Secretary chose an election system that his

12    only cybersecurity advisor objected to?

13            MR. RUSSO:  Object to the form of the

14        question.

15            THE WITNESS:  Well, I would clarify

16        that the Secretary, then-Secretary Kemp

17        convened the S.A.F.E. Commission and

18        appointed the members, and Secretary

19        Raffensperger sort of inherited the work

20        that they did.

21            So I don't think that Mr. Lee was

22        Secretary Raffensperger's cybersecurity

23        expert, but -- I mean, I think you'd have

24        to ask the person that made the decision.

25    BY MR. CROSS:
```

Page 23

1          Q.   Okay.  All right.  That's a fair point on

2     the chronology.  But when you say "ask the person

3     that made the decision," is that Secretary

4     Raffensperger?

5          A.   I think so.

6          Q.   Okay.  What cybersecurity experts, if any,

7     does Secretary Raffensperger rely on for evaluating

8     the security of the election system?

9               MR. RUSSO:  Object to the form of the

10              question.  Lacks foundation.

11              THE WITNESS:  Well, I know the

12              primary office point of contact, and I

13              assume this is the same, again, since I

14              left, I'm not sure, but Merritt Beaver was

15              our C.I.O., and he sort of coordinated

16              multiple groups and people and

17              cybersecurity defenses.

18                   I know that we worked with Department

19              of Homeland Security.  I know we worked

20              with a company called Fortalice.  And I

21              think he had some other individuals that

22              he could bring in for specific issues or

23              concerns or questions.

24     BY MR. CROSS:

25          Q.   Who were those individuals?

# Exhibit 1.1

Page 50

1    statements or evidence about exactly what had gone

2    on if it was a significant issue.

3        Q.   So you respond to Ms. Watson in this

4    E-mail:

5             "10-4, I assume you're

6          investigating."

7             Do you see that?

8        A.   Yes.

9        Q.   And was there an investigation done of the

10   concern that was raised by Laura Jones here on

11   November 5th of 2020?

12       A.   I don't know.  I assume there -- I assume

13   there was.  This is certainly the kind of thing

14   that would have risen to the level of an

15   investigation.

16       Q.   Who would you ask if you wanted to know

17   whether there was an investigation done and what

18   the outcome was?

19       A.   Well, now I'd ask the current -- I think

20   it's the interim investigator.  His name is James

21   Callaway.  Frances Watson has moved on.  She's no

22   longer there.  So I would ask Interim Chief

23   Investigator Callaway to -- he would be able to

24   give the status of any investigations.

25       Q.   When --

Page 62

1    on November 9, 2020, the description of the

2    violation is "many voting machines unlocked during

3    the day."

4             Do you see that?

5        A.   Yes.

6        Q.   And the location is the Hartwell polling

7    place library.  Do you see that?

8        A.   Yes.

9        Q.   And there's a Twitter link here.  And if

10   you read the whole context of the E-mail, you'll

11   see that whoever sent this in put up photos of

12   voting machines that were apparently, according to

13   this person, unlocked during the day.

14            Do you see that?

15       A.   I see that.

16       Q.   Do you know whether there was an

17   investigation done in this situation?

18       A.   I don't know.  But again, this is one that

19   I would certainly expect an investigation to have

20   been done.

21       Q.   If you wanted to review any -- review the

22   investigation file, any report, and understand what

23   was done and what the findings were, who would you

24   ask?

25       A.   The current acting chief, Mr. Callaway.

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

_____

DONNA CURLING, ET AL.,

      Plaintiffs,      CIVIL ACTION FILE
                         NO. 1:17-CV-2989-AT

vs.

BRAD RAFFENSPERGER, ET AL.,

      Defendants.

_____

VIDEO-RECORDED 30(b)(6) DEPOSITION

TAKEN VIA VIDEOCONFERENCE OF

GEORGIA SECRETARY OF STATES' OFFICE

BY: SANFORD MERRITT BEAVER

AND

SANFORD MERRITT BEAVER

IN HIS PERSONAL CAPACITY

(Taken by Plaintiffs)

Atlanta, Georgia

Wednesday, February 2, 2022

9:08 a.m.

Reported stenographically by
V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR

Page 2

```
 1                    APPEARANCES

 2   ON BEHALF OF THE PLAINTIFFS:
     (Appeared Via Videoconference)
 3
             DAVID D. CROSS, Esquire
 4           REILEY JO PORTER, Esquire
             LOGAN WREN, Esquire
 5           ZACHARY FUCHS, Esquire
             REEMA S. SHOCAIR ALI
 6           Morrison & Foerster LLP
             2100 L Street, NW, Suite 900
 7           Washington, D.C. 20037
             (202) 887-8795
 8           dcross@mofo.com

 9   ON BEHALF OF THE SECRETARY OF STATE
     and THE STATE ELECTION BOARD:
10   (Appeared Via Videoconference)

11           ALEXANDER DENTON, Esquire
             JAVIER PICO-PRATS, Esquire
12           CAREY MILLER, Esquire
             Robbins Alloy Belinfante
13           Littlefield LLC
             500 14th Street, NW
14           Atlanta, Georgia 30318
             (404) 856-3276
15           adenton@robbinsfirm.com
             jpicoprats@robbinsfirm.com
16           cmiller@robbinsfirm.com

17   ON BEHALF OF THE DEFENDANTS
     FULTON COUNTY VOTER REGISTRATION AND ELECTIONS:
18   (Appeared Via Videoconference)

19           DAVID LOWMAN, Esquire
             Office of the Fulton County Attorney
20           141 Pryor Street, SW, Suite 4038
             Atlanta, Georgia 30303
21           (404) 612-0286
             david.lowman@fultoncountyga.gov
22

23

24

25
```

Page 3

```
 1    APPEARANCES (Continued)
      (Appeared Via Videoconference)
 2
              MARILYN MARKS,
 3            Vice President and Executive Director
              Coalition For Good Governance
 4            1520 Cress Court
              Boulder, Colorado 80304
 5            (704) 292 9802
              Marilyn@USCGG.org
 6

 7    Also Present:

 8            JONATHAN MILLER, Videographer

 9

10

11

12

13

14

15

16

17            VIDEO-RECORDED 30(b)(6) DEPOSITION

18    TAKEN VIA VIDEOCONFERENCE OF GEORGIA SECRETARY OF

19    STATES' OFFICE BY: SANFORD MERRITT BEAVER AND

20    SANFORD MERRITT BEAVER IN HIS PERSONAL CAPACITY,

21    a witness called on behalf of the Plaintiffs,

22    before V. Dario Stanziola, CCR (GA)(NJ), RPR,

23    CRR, with the deponent located in Atlanta,

24    Georgia, on Wednesday, February 2, 2022,

25    commencing at 9:08 a.m.
```

Page 4

1                        INDEX OF EXAMINATIONS

2

3
     By Mr. Cross                           PAGE     7
4

5

6                        INDEX OF EXHIBITS

     NUMBER           EXHIBIT                MARKED
7

     Exhibit 1: Curling Plaintiffs' Second   10
8    Amended Notice of Deposition of
     Office of the Secretary of State
9
     Exhibit 2: Declaration of Merritt       23
10   Beaver

11   Exhibit 3: Declaration of S. Merritt    68
     Beaver
12
     Exhibit 4: LinkedIn Printout of         94
13   Merritt Beaver's profile page

14   Exhibit 5: Atlanta                      112
     Journal-Constitution article entitled
15   Case files discredit Kemp's
     accusation that democrats tried to
16   hack Georgia election

17   Exhibit 6: E-mail string with the top   115
     from Kevin Robertson dated 7/1/2020
18
     Exhibit 7: E-mail string with the top   129
19   from Kay Stimson dated 12/2/2020

20   Exhibit 8: ImageCast X ballot marking   135
     device document
21
     Exhibit 9: Document entitled            141
22   Information Technology Security
     Program Charter
23
     Exhibit 10: Document entitled           146
24   Fortalice Solutions Web Vulnerability
     Remediation Checks Secretary of State
25   Georgia Draft - July 14, 2020

Page 14

1    there was malware on it, if it at any way managed

2    to get to a new platform, it would be inert,

3    meaning it would have no capabilities in the new

4    environment.  Because based on this question, the

5    malware was targeting the old election system,

6    which was Windows-based using access database

7    application.

8              One of the smartest things that the

9    Georgia Secretary of State did was we moved to a

10   system that was completely different, meaning it

11   didn't use the same operating system, did not use

12   the application prior used, which means that

13   anything that was targeting that system would be

14   inert in a new system.  But even knowing that, we

15   did make sure that it didn't exist.

16        Q.   Okay. Let me -- we'll come back to that

17   answer.  But let me come back to the question I

18   asked you.  What did you do to prepare to testify

19   on topic 1A?

20        A.   I validated with my team that we built

21   out a whole different system not connected at any

22   reason or physically or electronically to the old

23   system.  We had no components of the old system,

24   no software, no data, no anything.  And the

25   reason was the two systems were so different

Page 15

1   there was absolutely nothing in the old system

2   that was useful in the new system.  So there was

3   no reason to move any of that stuff over there.

4   The old system was old equipment.  We didn't need

5   to use any old equipment.  We started fresh.  And

6   there was nothing on the old system that was

7   needed in the new system.  So there was no effort

8   to even try to connect the two.  Because it would

9   have made no value, added no value.

10       Q.   When you say you validated this with

11   your team what did you do to validate that?

12       A.   I met with my team, met with the people

13   that were actually hands on doing it, the work,

14   and validated this is the process we follow.

15       Q.   When did you do that?

16       A.   Probably at least two or three weeks

17   ago.  Well -- and I -- we did it a long time ago

18   when we actually did the move.  We met and talked

19   about how we were going to do it.  That was back

20   when we actually built out the new system.  We

21   did a whole plan as to how we would built --

22   would build it out.  There was conversation of is

23   there anything needed from the old system?  The

24   answer was no.  Do we need any of the data on the

25   system?  No.  So there was no effort to even try

1    anyone in the Secretary's office?

2        A.   I would have expected to because I

3    would have been asked to help investigate how it

4    happened.

5        Q.   Okay.

6        A.   We manage security.  That would be an

7    event.  And we would go through our whole

8    incident response process to investigate how

9    something like that would have happened.  So I

10   would have expected to hear.

11       Q.   Okay.  And what did you do to prepare

12   yourself to testify on topic ten today?

13       A.   To prepare for that?  I asked -- I

14   asked a couple people here within our

15   organization in the elections area whether or not

16   they'd heard anything about this.  I didn't hear

17   anything.

18       Q.   Who did you ask?

19       A.   They didn't say -- over in elections --

20   I mean, I think the head of elections, Blake

21   Evans, is over there.

22       Q.   Anyone else?

23       A.   I guess I -- I've asked around.  I

24   don't remember the people, just poking at people

25   that might have heard something.  And within our

Page 53

1   security group we have a couple -- three people

2   over there in that group which I talked about

3   Ronnell Spearman, Kevin Fitts.  They're -- they

4   had not heard anything.  So...

5         Q.   Is there anyone else you talked to

6   about topic ten that comes to mind?

7         A.   No.

8         Q.   Okay.  Did you review any documents in

9   preparation for your testimony on any of the

10  topics you're designated on?

11        A.   Just my prior depositions and

12  testimony.

13        Q.   When you say deposition, you mean your

14  prior declarations in this case?

15        A.   I guess I'm not sure whether they were

16  declarations or depositions.

17        Q.   Okay.

18        A.   I didn't -- they were just documents

19  that were -- the legal team gave me as areas

20  where -- or events where I was recorded, whether

21  it be court transcriptions or depositions or

22  declarations.  So it was three or four of them.

23        Q.   Okay.  But those documents all

24  contained testimony that you gave in -- in some

25  form; is that fair?

1   right?

2        A.   Correct.

3        Q.   And Fortalice found vulnerabilities

4   with each of those two systems.  But, again, no

5   evidence that data had been altered or extracted;

6   is that right?

7        A.   Correct.  And both were fixed.

8        Q.   Right.

9             And measures were taken by the

10  Secretary's office sometime in that weekend when

11  this issue came to light to -- to mitigate both

12  of those vulnerabilities; is that right?

13       A.   Yes.  My best -- well, I know we fixed

14  the stuff right away that weekend, so...

15       Q.   Okay.  Did you -- were you given an

16  opportunity to review any of the public

17  statements that the Secretary's office put out or

18  any communications with the press about those

19  incidence before those statements were made?

20       A.   Not that I recognize -- I mean,

21  remember.  I mean, I focus on the IT

22  infrastructure press releases and all that media

23  kind of stuff is handled by the Secretary's front

24  office.

25       Q.   Okay.  And was there ever a time in the

Page 183

 1   times in the last four years, four or five years.

 2        Q.   When was the decision made to move away

 3   from E-Net?

 4        A.   Last year.

 5        Q.   Who made that decision?

 6        A.   Front office.

 7        Q.   And by front office who do you mean?

 8        A.   Secretary.

 9        Q.   Oh, Secretary Raffensperger?

10        A.   Yes.  Those kind of decisions, it comes

11   down to him to make the call.  We present

12   proposals and it's up to him to say yay, nay.

13        Q.   What --

14        A.   It's a big decision.

15        Q.   Sorry.

16        A.   Yeah, that was a big, big decision.

17        Q.   What were those specific reasons that

18   he decided to move -- to replace E-Net?

19        A.   One was the age, one was the ability

20   for us to get, like this, certain fixes put in

21   place that we wanted to see.  Some of it was

22   security related, some was just functionality

23   related.  The application was built I think like

24   in 2012 when we first purchased it.  And the --

25   but the actual application was probably built a

**Exhibit 3**

Page 260

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, ET AL.,              )
                                    )
Plaintiffs,                    )
                                    )  Civil Action No.
vs.                                 )
                                    )  1:17-CV-2989-AT
BRAD RAFFENSPERGER, ET AL.,         )
                                    )
Defendants.                    )



VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

SANFORD MERRITT BEAVER

Thursday, March 10, 2022

9:09 a.m.

VOLUME II (Pages 260 - 439)


Robin K. Ferrill, CCR-B-1936, RPR

Page 261

```
 1              APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs Donna Curling, Donna
     Price & Jeffrey Schoenberg
 3
     DAVID D. CROSS, Esquire
 4        Morrison & Foerster LLP
          2100 L Street, N.W., Suite 900
 5        Washington, D.C.  20037-1679
          202.887.1500
 6        dcross@mofo.com

 7

 8   On behalf of the Plaintiff Coalition for Good
     Governance
 9
     ERIC R. HAVIAN, Esquire
10        Constantine Cannon LLP
          150 California Street, Suite 1600
11        San Francisco, California  94111-4553
          415.639.4001
12        ehavian@constantinecannon.com

13

14   On behalf of the Defendant Brad Raffensperger

15   BRYAN P. TYSON, Esquire
          Taylor English Duma LLP
16        1600 Parkwood Circle, Suite 200
          Atlanta, Georgia  30339-2119
17        678.336.7249
          btyson@taylorenglish.com
18

19   On behalf of the State Defendants

20   ALEXANDER DENTON, Esquire
     CAREY MILLER, Esquire
21   JAVIER PICO-PRATS, Esquire
          Robbins Alloy Belinfante Littlefield LLC
22        500 14th Street, N.W.
          Atlanta, Georgia  30318
23        678.701.9381
          adenton@robbinsfirm.com
24        cmiller@robbinsfirm.com
          jpicoprats@robbinsfirm.com
25
```

Page 262

1              APPEARANCES OF COUNSEL (continued)

2    DAVID R. LOWMAN, Esquire
          Fulton County Attorney's Office
3         141 Pryor Street, S.W., Suite 4038
          Atlanta, Georgia  30303-3468
4         404.612.0246
          david.lowman@fultoncountyga.gov
5

6

7    ALSO PRESENT:

8         DUNCAN BUELL

9         JENNA CONAWAY, Senior Paralegal, Morrison &
          Foerster LLP
10
          JILL CONNORS, Legal Assistant, Ichter Davis, LLC
11
          MARILYN MARKS, Executive Director
12        SUSAN GREENHALGH, Consultant
          Coalition for Good Governance
13
          KEVIN SKOGLUND, Citizens for Better Elections
14
          Jonathan Miller, Videographer
15

16

17

18

19

20

21

22

23

24

25

Page 263

```
 1                          INDEX

 2        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

 3                  SANFORD MERRITT BEAVER

 4                  Thursday, March 10, 2022

 5   EXAMINATION BY                              PAGE

 6   By Mr. Cross                                268

 7   By Mr. Havian                               394

 8   By Mr. Denton                               433

 9
              DESCRIPTION OF EXHIBITS
10
     EXHIBIT          IDENTIFICATION            PAGE
11

12   Exhibit 1   Fortalice Solutions Technical    268

13               Assessment Prepared for Secretary

14               of State Georgia, DRAFT - May 19,

15               2020, Bates labeled

16               FORTALICE003593 - FORTALICE003624

17   Exhibit 2   Fortalice Solutions Firmware      311

18               Comparison and Configuration

19               Analysis, Secretary of State

20               Georgia, DRAFT - July 9, 2020,

21               Bates labeled FORTALICE003807 -

22               FORTALICE003811

23

24

25
```

Page 394

1    Q.   All right.

2         MR. CROSS:  I don't have any further

3    questions for you, Mr. Beaver.  I understand

4    another lawyer for some other Plaintiffs will

5    ask you some questions.

6         But thank you.  I appreciate you taking the

7    time.

8         THE WITNESS:  Okay.  Can we take two

9    minutes so I can see who's at the front door?

10        MR. HAVIAN:  Yes.  Actually, let's take ten

11   minutes because I want to pull stuff together

12   and then we will go back on the record and I

13   will be finishing up with you.  Okay?

14        THE WITNESS:  Thank you.

15        THE VIDEOGRAPHER:  The time is 12:04.  We

16   are off the record.

17        (WHEREUPON, a recess was taken.).

18        THE VIDEOGRAPHER:  The time is 12:14.  We

19   are back on the record.

20   EXAMINATION

21   BY MR. HAVIAN:

22        Q.   Good afternoon, or I guess it's just

23   afternoon your time, Mr. Beaver.  This is -- my name

24   is Eric Havian and I am appearing for the Coalition

25   for Good Governance.  We have a total of an hour and

Page 395

1    14 minutes that we are allotted to question you, but

2    I know it's lunchtime back there.  So I'm going to

3    ask do you guys -- are you okay just going through

4    and finishing or would you prefer to take a break and

5    get something to eat?

6         A.   I prefer just finishing.

7         Q.   Okay.  That's what most witnesses prefer to

8    do, but I figured I would give you the choice.

9              MR. DENTON:  Eric, before you continue, I

10             just have -- have you made an appearance in this

11             case?

12             MR. HAVIAN:  Yes, I have a pro hac vice

13             application that's currently pending.

14             MR. DENTON:  Okay.  So you haven't made an

15             appearance?

16             MR. HAVIAN:  We checked the rules.  It's

17             our understanding of the rules in Georgia that I

18             don't need to make a formal appearance.  If I

19             have made a pro hac vice application, that

20             serves as my Notice of Appearance.

21             MR. DENTON:  That's fine.  I just wanted to

22             understand.

23             MR. HAVIAN:  Yes.  I presume you should be

24             served at some point electronically with the pro

25             hac application I filed.

Page 396

1          MR. DENTON:  Yes, I saw the application.  I

2     just haven't seen anything further.

3          Thank you.

4          MR. HAVIAN:  You are welcome.

5          (Plaintiffs' Exhibit 11, Curling

6     Plaintiffs' Fifth Amended Notice of Deposition

7     of Office of the Secretary of State, marked for

8     identification.)

9     Q.   (By Mr. Havian) Okay.  Mr. Beaver, let's

10    jump right in.  I would like to have you take a look

11    at Exhibit 11.

12    A.   Okay.

13    Q.   Which is a Notice of Deposition.  And the

14    pages, at least on my copy, do not appear to be

15    numbered.  But if you could -- if you could scroll

16    down to Topic Number 10, which is about

17    three-quarters of the end of the document.

18    A.   Does it start with any instance in 2020 and

19    2021?

20    Q.   Correct.  That says "Any instance in 2020

21    or 2021, within the knowledge of the Secretary of

22    State's Office, when a person or entity other than an

23    authorized election worker or Georgia state or county

24    official obtained voting data from a Georgia election

25    or images of voting equipment used in a Georgia

Page 397

1    election."

2            Do you see that?

3    A.    Yes.

4    Q.    That's going to be the primary area of my

5    focus today.  Are you prepared to address that issue

6    today?

7    A.    I can answer to my knowledge.

8    Q.    Have you taken any steps to gather

9    knowledge of any other persons in the Georgia

10   Secretary of State's Office about this issue?

11   A.    No.

12   Q.    Okay.  I believe it was yesterday or

13   perhaps the evening before yesterday, Mr. Bruce

14   Brown, counsel for the Coalition, sent an e-mail to

15   Mr. Russo and Mr. Miller asking that you, in

16   particular, focus on a particular aspect of Issue

17   Number 10.  And I'll read that to you.  It says "That

18   examination will focus primarily on the events

19   discussed in the audio recording marked as Exhibit 12

20   and played at the deposition of Gabriel Sterling

21   involving the imaging of election hardware and

22   software in Coffee County.  Please ensure that the

23   witness is prepared to address that aspect as well as

24   the other aspects of Issue 10."

25            I guess my question is, are you aware --

# Exhibit 4

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION


  DONNA CURLING, ET AL.,

        Plaintiffs,
                           CIVIL ACTION FILE
  vs.                        NO. 1:17-CV-2989-AT

  BRAD RAFFENSPERGER, ET AL.,

        Defendants.




            VIDEOTAPED ZOOM DEPOSITION OF
                   MICHAEL BARNES

              February 11, 2022
                  9:04 A.M.



  Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
```

```
 1                  APPEARANCES OF COUNSEL

 2              (All appearances via Zoom)

 3

 4   On behalf of the Plaintiffs:

 5       DAVID D. CROSS, ESQ.
         ZACHARY FUCHS, ESQ.
 6       SONJA N. SWANBECK, ESQ.
         LOGAN WREN, ESQ.
 7       NICHOLAS KENNEDY, ESQ.
         JENNA CONAWAY, ESQ.
 8       MORRISON & FOERSTER LLP
         2100 L Street, NW
 9       Suite 900
         Washington, DC 20037
10       202.887.8795
         dcross@mofo.com
11       zfuchs@mofo.com
         sswanbeck@mofo.com
12       lwren@mofo.com
         jconaway@mofo.com
13

14   On behalf of Secretary of State and the State
     Election Board:
15
         DIANE F. LaROSS, ESQ.
16       TAYLOR ENGLISH DUMA LLP
         1600 Parkwood Circle, SE
17       Suite 200
         Atlanta, Georgia 30339
18       678.336.7249
         dlaross@taylorenglish.com
19

20

21

22

23

24

25
```

Page 3

1                  APPEARANCES OF COUNSEL

2                (All appearances via Zoom)

3

4   On behalf of Defendants Fulton County Voter
    Registration and Elections:
5
         DAVID LOWMAN, ESQ.
6        OFFICE OF THE FULTON COUNTY ATTORNEY
         141 Pryor Street, SW
7        Suite 4038
         Atlanta, Georgia 30303
8        david.lowman@fultoncountyga.gov

9

10
    Also Present:
11
         Krishan Patel, Videographer
12       Danielle Hernandez
         Marilyn Marks, Representative Coalition for
13       Good Governance
         Susan Greenhalgh, CGT Consultant
14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          INDEX OF EXAMINATION

2      WITNESS:  MICHAEL BARNES

3      EXAMINATION                                   PAGE
       By Mr. Cross                                    9
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                  Deposition of MICHAEL BARNES
                        February 11, 2022
2

3              (Reporter disclosure made pursuant to

4       Article 8.B of the Rules and Regulations of the

5       Board of Court Reporting of the Judicial

6       Council of Georgia.)

7              VIDEOGRAPHER:  Today's date is

8       February 11, 2022, and the time is 9:04 a.m.

9       This will be the remote videotaped deposition

10      of Michael Barnes.

11             Will counsel please introduce themselves

12      and any objection to the witness being sworn in

13      remotely.

14             MR. CROSS:  This is David Cross of

15      Morrison & Foerster on behalf of the Curling

16      plaintiffs.

17             MS. LaROSS:  Diane LaRoss on behalf of the

18      State defendants and Mr. Barnes.  We also have

19      Danielle Hernandez on the line with us from our

20      team.

21             MR. LOWMAN:  And this is David Lowman on

22      behalf of the Fulton County defendants.

23             MS. MARKS:  This is Marilyn Marks,

24      plaintiffs' representative, Coalition for Good

25      Governance.

Page 9

 1        MICHAEL BARNES, having been first duly sworn,

 2    was examined and testified as follows:

 3    EXAMINATION

 4    BY-MR. CROSS:

 5        Q.   Good morning, Mr. Barnes.

 6        A.   Good morning, Mr. Cross.  How are you?

 7        Q.   Good.  How are you?

 8        A.   I'm doing well.  Happy Friday.

 9        Q.   I'm sure this is the way you always want

10    to spend a Friday; right?

11        A.   Well, I could probably think of some

12    better things to do, but, alas, we have to take care

13    of this.

14        Q.   We do.

15             All right.  You've been deposed before.

16    In fact, I think you may have been deposed in this

17    case years ago, so you've been through this before.

18             Do you understand that today you're

19    testifying on behalf of the Secretary of State's

20    office as what we call a corporate representative?

21        A.   Yes, sir, that's my understanding.

22        Q.   You understand that you are here to

23    testify on behalf of the Secretary of State's office

24    on specific topics; is that right?

25        A.   Yes, sir.  Yes, sir.

Page 10

1          Q.   Okay.  Do you have Exhibit Share open in

2     front of you?

3          A.   I have access to it.  One second.

4               So yes, sir.

5          Q.   All right.  So pull up Exhibit 1, please.

6               (Plaintiffs' Exhibit 1 was marked for

7          identification.)

8               THE WITNESS:  Under which folder?

9     BY MR. CROSS:

10         Q.   Oh, go down to -- you'll see "Deposition

11    of Michael Barnes 2/11."

12         A.   Actually, I don't see that.  I see 2/16,

13    2/3, 2/4, 2/9.

14         Q.   Weird.

15              So if you come down, you see where it says

16    "Deposition of Merritt Beaver," and then immediately

17    below that "Michael Barnes"?  Or I don't know, maybe

18    you can only see certain things.

19              You don't have a Michael Barnes 2/11/2022?

20         A.   I do not.  I have Gabriel Sterling 2/16,

21    Michael Barnes 2/3, Michael Barnes 2/4, Michael

22    Barnes 2/9.

23              MR. CROSS:  All right.  Let's go off the

24         record.

25              VIDEOGRAPHER:  The time is 9:07 a.m.  We

Page 11

1      are off the record.

2            (Off the record.)

3            VIDEOGRAPHER:  The time is 9:12 a.m.

4      We're on the record.

5  BY MR. CROSS:

6      Q.  All right.  Mr. Barnes, you have

7  Exhibit 1?

8      A.  Yes, sir, I do.

9      Q.  All right.  So take a look at Exhibit 1 in

10 front of you.

11           And do you understand that you are

12 designated to testify today on Topic 1?

13     A.  Yeah, I remember seeing a list of topics

14 in which I was designated as being the one that

15 would speak.

16     Q.  Okay.  So just read through Topic 1, the

17 subparts a through h, and tell me if you're prepared

18 to testify on that topic today.

19           MS. LaROSS:  And, David, we're going to be

20      reserving all objections except those to the

21      form of the question or responsiveness of the

22      answer until trial; is that correct?

23           MR. CROSS:  Yeah, that's the default under

24      the federal rules, yeah.

25           MS. LaROSS:  Sure.  And I just -- you

Page 12

1          know, we go into each deposition and often say

2          it or don't, but I just wanted to clarify --

3                    MR. CROSS:  Okay.

4                    MS. LaROSS:  -- we just have that standing

5          agreement with you guys.  That's -- I just

6          wanted the record to be clear.

7                    MR. CROSS:  Okay.

8                    THE WITNESS:  I've looked at the items in

9          point 1a through h, and those are the items I

10         am familiar with, yes, sir.

11   BY MR. CROSS:

12         Q.   Okay.  Then go on to Topic 2, please, and

13   let me know if you're prepared to testify on that

14   today.

15                   MS. LaROSS:  David, I believe David

16         Sterling is designated for 2c.

17                   MR. CROSS:  Okay.  Great.  That's right.

18         Sorry.

19   BY MR. CROSS:

20         Q.   So, Mr. Barnes, just look at 2a, b, and d.

21         A.   2a, b, and d, I -- I believe I'm prepared

22   to testify on those items.

23         Q.   Okay.  And then look at Topics -- just to

24   make sure -- yeah, look at Topics 7 through 11, so

25   7, 8, 9, 10, and 11, and let me know if you're

Page 13

1    prepared to testify on those topics today.

2         A.   Yes, sir, I believe I'm prepared.

3         Q.   And then the last one is Topic 18, the

4    last one in the list, and let me know if you're

5    prepared to testify on that, too, please.

6              MS. LaROSS:  It's my understanding, David,

7         that that one -- that topic was -- we

8         designated David Sterling, Merritt Beaver, and

9         Chris Harvey.

10             MR. CROSS:  Sorry.

11             MS. LaROSS:  And some of the topics in the

12        7 --

13             MR. CROSS:  Yeah, that's right.  Sorry.

14        Yeah.

15             MS. LaROSS:  Okay.  No -- no worries.

16             And some of the topics in 7 through 11 we

17        also designated either Mr. Sterling or

18        Mr. Beaver, but there is certainly overlap with

19        Mr. Barnes.

20             MR. CROSS:  Yeah.  Okay.

21             MS. LaROSS:  Great.  Thank you.

22    BY MR. CROSS:

23        Q.   Mr. Barnes, what did you do to prepare to

24    testify on these topics today?

25        A.   I have met with our attorneys.

Page 14

1          Q.   And when did you do that?

2          A.   Let's see.  In multiple occasions.  Met

3     with attorneys last week in preparation for

4     deposition and also, I believe, a couple of weeks

5     prior to that.

6          Q.   Okay.  About how many hours would you say

7     you spent preparing?

8          A.   Let's see.  Last week, I was here in the

9     law office for, I believe, three and a half hours.

10    In the previous visit to the attorneys' office, that

11    was another two- to three-hour meeting.

12              And this list of items had been provided

13    to me to look over and, you know, keep my memory

14    fresh on these items to the best of my ability.

15         Q.   Okay.  And did you review any documents to

16    prepare for these topics?

17         A.   The only documents that I've looked over

18    in preparation are previous records in the case,

19    previous -- I think some of my previous deposition,

20    reviewed that and other filings, I think, a couple

21    of times where I testified in court.  Those

22    documents I reviewed.

23         Q.   Did you look, for example, at -- at emails

24    or documents from the Secretary's office?

25         A.   I did not go through a list of the emails

Page 15

1   that I maintain in my Secretary of State inbox

2   looking for specific topic emails, no, sir.

3        Q.   Okay.  Did you speak with anyone other

4   than counsel to prepare on those topics?

5        A.   No.  I've only spoken with counsel.

6        Q.   All right.  Look at Topic 1 if you've got

7   that in front of you, please.

8        A.   Sure.

9        Q.   And if you look at 1a.

10        Walk me through the efforts that have been

11   made to determine whether malware has ever been

12   located on any component of Georgia's prior election

13   system, the DRE system.

14        A.   With the prior voting system, the system

15   that was used in the state from 2002 through, what,

16   2018, that system was constantly being inspected and

17   tested to make sure that what was installed at the

18   local levels matched what had been federally

19   certified and state certified throughout the years.

20        My office, the Secretary of State's

21   office, whenever we were out in the field, in the

22   counties, any opportunity that we had to sit down at

23   the Election Management computer, we would do a -- a

24   verification test based upon hash signatures on the

25   applications to validate that what was installed on

Page 33

1    and accuracy testing on the old DRE system.

2            Is there other testing that was done to

3    look for malware or some other compromise of the DRE

4    system, to your knowledge?

5        A.   I -- I do not recall at this moment.

6        Q.   Do you know why the Secretary's office

7    never performed any forensic examination of any of

8    the DRE voting equipment or the -- or the servers,

9    the GEMS servers?

10           MS. LaROSS:  Objection to the form of the

11       question.

12           THE WITNESS:  No, sir, I do not.

13   BY MR. CROSS:

14       Q.   Who would make that decision on whether to

15   conduct that type of examination?

16       A.   I believe that would be a decision that

17   would be made by the Secretary.

18       Q.   Do you know if there was ever discussion

19   or consideration of that type of examination of the

20   old system?

21       A.   I do not know.

22       Q.   Who would you ask if you wanted to know?

23       A.   I -- I would ask, most likely, our general

24   counsel.

25       Q.   Is that Ryan Germany?

Page 296

1          that it's accessible to our voters, and that it

2          is reflective of what the voters wish to purvey

3          to the State when an election takes place.

4   BY MR. CROSS:

5          Q.   Can you identify one cybersecurity

6   election expert that has endorsed the current

7   Georgia system as a reliable voting system?

8          A.   I cannot.

9          Q.   Is voter confidence in that system

10  important?

11         A.   Voter confidence in all that we do as the

12  elections divisions important.  It's important that

13  they have confidence in the people that run

14  elections.  It's important that they have confidence

15  in the systems that we use.  It's important that

16  they have confidence in the voter registration

17  system.

18          And we work day in and day out doing what

19  we can to secure the system that we have.

20         Q.   But if you're confident that the system is

21  secure, particularly in an environment now where

22  there have been extraordinary claims made about the

23  reliability of that system, why not just have an

24  election security expert analyze it, examine it, and

25  offer an opinion on whether it's reliable?

Page 297

1              MS. LaROSS:  I object to the form of the

2         question.

3              THE WITNESS:  I'm sure if the

4         Secretary of State decided that he wanted to do

5         that, that that would get done.

6    BY MR. CROSS:

7         Q.  And as you sit here, you don't know why

8    he's not decided that; right?

9              MS. LaROSS:  I object to the form of the

10        question.

11             THE WITNESS:  I do not.

12   BY MR. CROSS:

13        Q.  Do you think voters would have more

14   confidence in a system that did not use QR codes,

15   where what was getting tabulated, they could

16   actually read for themselves?

17             MS. LaROSS:  I object to the form of the

18        question.

19             THE WITNESS:  I don't know.  Voters have

20        confidence in systems, and it seems like in

21        today's environment, voters only have

22        confidence in systems that -- where the people

23        that they supported in the election won and

24        they don't have -- they don't have good

25        confidence in systems when their candidate of

**Exhibit 5**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,          )
                                )
     Plaintiffs,                )
                                )
vs.                             )     CIVIL ACTION NO.
                                )
BRAD RAFFENSPERGER, ET          )     1:17-CV-2989-AT
AL,                             )
                                )
     Defendants.                )

VIDEOTAPED 30(b)(6) DEPOSITION OF GABRIEL STERLING

(Taken by Plaintiffs)

February 24, 2022

9:07 a.m.

Reported by:   Debra M. Druzisky, CCR-B-1848

```
 1                  APPEARANCES OF COUNSEL

 2   On behalf of the Curling Plaintiffs:

 3        DAVID D. CROSS, Esq.
          HANNAH ELSON, Esq.
 4        JENNA CONAWAY, Esq.
          LOGAN WREN, Esq.
 5        SONJA SWANBECK, Esq.
          REEMA SHOCAIR ALI, Esq.
 6        REILEY PORTER, Esq.
          Morrison & Foerster
 7        2100 L Street NW, Suite 900
          Washington, D.C.  20037
 8        (202) 887-8795
          dcross@mofo.com
 9

10   On behalf of the Coalition Plaintiffs:

11        JILL CONNORS, Esq.
          Ichter Davis
12        3340 Peachtree Road, Suite 1530
          Atlanta, Georgia  30326
13        jconnors@ichterdavis.com

14        -and-

15        BRUCE P. BROWN, Esq.
          Bruce P. Brown Law
16        1123 Zonolite Road, Suite 6
          Atlanta, Georgia  30306
17        (404) 881-0700
          bbrown@brucepbrownlaw
18        -and-
19
          ROBERT A. MCGUIRE, III, Esq.
20        The Robert McGuire Law Firm
          113 Cherry Street, #86685
21        Seattle, Washington  98104
          (253) 267-8530
22        ram@lawram.com

23

24

25
```

Page 3

```
 1          APPEARANCES OF COUNSEL (Continued.)

 2   On behalf of the Defendants Georgia Secretary of
     State and State Election Board:
 3
         VINCENT R. RUSSO, Esq.
 4       Robbins Ross Alloy Belinfante Littlefield
         500 14th Street
 5       Atlanta, Georgia  30318
         (678) 701-9381
 6       vrusso@robbinsfirm.com

 7       -and-

 8       DIANE F. LAROSS, Esq.
         Taylor English Duma
 9       1600 Parkwood Circle, Suite 200
         Atlanta, Georgia 30339
10       (770) 434-6868
         dlaross@taylorenglish.com

11

12   On behalf of the Defendant Fulton County Voter
     Registration and Elections:
13
         DAVID LOWMAN, Esq.
14       Office of the Fulton County Attorney
         141 Pryor Street, Suite 4038
15       Atlanta, Georgia  30303
         (404) 612-4000
16       david.lowman@fultoncountyga.gov

17

     Also Present:
18
         Chris Bennett, videographer
19       Susan Greenhalgh
         Marilyn R. Marks
20       Duncan Buell
         Philip Stark
21
                        --oOo--
22

23

24

25
```

1          THE VIDEOGRAPHER:  All right.  This

2     will be the deposition of Gabriel Sterling

3     in the case of Curling versus

4     Raffensperger, File Number

5     1:17-CV-2989-AT.  Today's date is February

6     24th, 2022, and the time is 9:07 a.m.  And

7     we are on the record.

8          Would the court reporter please swear

9     in the witness?

10               GABRIEL STERLING,

11   having been first duly sworn, was examined and

12   testified as follows:

13               EXAMINATION

14   BY MR. CROSS:

15     Q.   Good morning, Mr. Sterling.

16     A.   Good morning, Mr. Cross.

17          (Whereupon, a technical discussion

18       ensued off the record.)

19   BY MR. CROSS:

20     Q.   All right.  Mr. Sterling, I understand

21   you've been deposed before, I think relatively

22   recently, in fact, so this will be similar to your

23   prior experience.

24          You -- do you understand that you're here

25   to testify today on behalf of the Secretary of

Page 9

1    State's office on specific topics that they've

2    designated you on?

3         A.   Yes.

4         Q.   Okay.  And do you have the Exhibit Share

5    in front of you?

6         A.   I do.

7                        (Whereupon, Plaintiff's

8                         Exhibit 1 was marked for

9                         identification.)

10   BY MR. CROSS:

11        Q.   Okay.  Can you pull up Exhibit 1, please?

12        A.   Okay.

13        MR. RUSSO:  Hey, David, I don't mean

14   to interrupt, but I'm just going to raise

15   one quick issue here.  You guys are going

16   to split, I understand Bruce said you all

17   are splitting time today?

18        Okay.  So you guys figured that out.

19   I just wanted to make sure it was -- we

20   were clear that that was our understanding

21   also --

22        MR. CROSS:  Yeah.

23        MR. RUSSO:  -- before we got started.

24   Okay.

25        THE WITNESS:  I've got Exhibit 1

1    hand-marked paper ballot could be double-marked if

2    you had a bad actor.

3           So most of these vulnerabilities I've

4    heard about, generally speaking.  I don't know if

5    that's what it says in this report, but as I said,

6    I've generally heard before, it requires bad actors

7    doing bad things.

8           So as long as you have the mitigation in

9    place, this may -- again, both process and

10    personnel-wise, you are -- you can mitigate most

11    vulnerabilities.  Because every system in the world

12    has vulnerabilities, especially ones that involve

13    human beings.  Because human beings are the

14    biggest, you know, failure point of any system.

15    Q.   So I gather no one has told you that Judge

16    Totenberg authorized the Secretary of State's

17    office to review Dr. Halderman's July report and

18    that she authorized that weeks or months ago;

19    nobody told you that?

20    A.   No.  I was aware that that happened and

21    that Ryan Germany in our office reviewed it.

22    Q.   But were -- you're not aware before now

23    that she has not restricted that report to

24    attorneys' access in the Secretary's office; is

25    that right?

Page 27

1        A.   I don't believe I said that.  I said we

2   were aware that, you know, that Ryan Germany, he's

3   in our office and he reviewed it.

4        Q.   Well, Ryan Germany is a lawyer; right?

5        A.   But he's inside of our office.

6        Q.   Right.  But you testified earlier you had

7   not read it because you understood it was limited

8   to lawyers.

9        A.   Early on, yes.  Now, you asked me over the

10  whole period of time.  I'm not -- it's not relevant

11  to what I'm working on now.  I'm the C.O.O.  I'm

12  not the voting system implementation manager now.

13       But I also, as I said before, have a basic

14  belief and understanding of what I've seen from

15  most reports like these where, outside of the

16  specifics, that most of them have to involve around

17  bad actors doing bad things, and that's just, that

18  is not rocket science to figure out.  It's not any

19  major thing that I've seen.

20       And I'm sure that there are things in

21  every computer system that can be shored up in some

22  way, shape or form.  And I'm sure that Dominion,

23  who is the manufacturer of these things, is working

24  on those things.  I believe they have access to the

25  report as well now, too.

Page 28

1      Q.   Okay.  So is it now your testimony you do

2   understand that the report is no longer limited to

3   lawyers for the Secretary of State's office; is

4   that right?

5      A.   That is correct.  I didn't say that I -- I

6   said -- I talk to my lawyers and say you need to

7   read it?  I'm not worried -- I wasn't really

8   worried about it yet, because it's nothing that I'm

9   directly working on right now in that particular

10  function.

11     Q.   Who at the Secretary's office has read the

12  report now?

13     A.   As far as I understand it, Ryan Germany.

14     Q.   So the Secretary himself has not read it?

15     A.   I don't know.

16     Q.   Well, you're testifying on behalf of the

17  Secretary's office today as a corporate

18  representative.  So I'm asking --

19     A.   Yes, I am.

20     Q.   I'm asking you as a corporate

21  representative, has the Secretary himself read this

22  report?

23     A.   And my answer remains the same, that I

24  don't know.

25     Q.   Okay.  And how would you find that out?

Page 29

1      A.   I guess I would probably have to call him

2   and ask him.  It didn't occur to me to ask him

3   beforehand.

4      Q.   And has Jordan Fuchs read the report?

5      A.   As I stated, the only person I'm aware of

6   reading the report in our office is Ryan Germany.

7      Q.   And so in preparation for today's

8   deposition, you didn't ask anyone in the office

9   other than Mr. Germany whether they had read this

10   report; is that right?

11      A.   I didn't ask Mr. Germany.  He informed me

12   a couple weeks ago when he read it, I believe.  So

13   it wasn't a question of me asking him if he had

14   done it.  He said, hey, I read it.  I said, oh,

15   okay.

16      Q.   So in preparation for today, you didn't

17   ask anyone at all whether they had read it?

18      A.   No.  I wasn't under the impression I would

19   need to.

20      Q.   Okay.  Don't you need to understand the

21   specific vulnerabilities identified in the report

22   to be sure that you mitigate them?

23      A.   Me personally?  I don't think that I would

24   need to, because that's not necessarily my role.

25   Dominion, who is our contractor, we have a contract

1     A.    To me it's kind of an ongoing process.

2    Because I'm dealing with them all the time on

3    different things that were tangential or con --

4    directly substantive to this.

5          But probably, you know, well over a month

6    ago, probably two months ago, if not even before

7    that to a degree.  Because we knew this was -- I

8    think at that point we'd -- I don't know if I was

9    "named" named as the 30(b)(6) for this, but we knew

10   it was a likelihood that I would be called for some

11   of these kind of things, so just kind of refreshing

12   my memory on some of the stuff we'd done previously

13   and then kind of going over some of the specifics.

14     Q.    Is there anyone you met with or spoke with

15   to prepare for your testimony today beyond

16   Mr. Beaver, Mr. Germany, Mr. Barnes, Mr. Evans or

17   counsel?

18     A.    Not specifically, no.  And to -- but I

19   could have met with people that some of their

20   information might feed some of the responses to

21   this, but it wasn't specifically for that purpose.

22     Q.    Okay.  And what did you discuss with

23   Mr. Beaver to prepare for today?

24     A.    If memory serves, we were really talking

25   about operating systems, you know, noting that the

**Exhibit 6**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## DECLARATION OF RYAN GERMANY

I, Ryan Germany, declare under penalty of perjury that the following statements are true and accurate to the best of my knowledge.

**Background**

1.    I am the General Counsel for the Office of the Georgia Secretary of State. I have held that position since January 2014. My job responsibilities include providing legal advice and guidance to all divisions of the Secretary of State's Office, including the Elections Division. I also work closely with the State Election Board. I routinely interact with county election officials.

**Investigations Division**

2.    One of the divisions of the Secretary of State's office is the Investigations Division. That Division has 24 investigators that oversee matters concerning elections, charities, securities, professional licensing,

corporations, and cemeteries. All of the investigators in the Investigations Division are certified peace officers by the Georgia Peace Officer Standards and Training (POST) Council. As POST-certified law enforcement officers, Secretary of State investigators carry weapons and can make arrests.

3.      In the course of an investigation, Secretary of State investigators gather pertinent information, conduct relevant interviews, and report findings to the governmental entity which authorized or referred the investigation to our office. Those entities include the State Election Board, various Professional Licensing Boards, the Secretary of State (in his capacity as Securities Commissioner), the Attorney General's office, and various local prosecutors.

4.      The investigations the Secretary's office conducts may result in civil enforcement actions pursued by the relevant entity and/or criminal prosecution pursued by the appropriate prosecuting authority.

5.      In addition to attending to investigations referred by Georgia governmental entities, the Secretary's investigators also work with other investigative authorities within and outside of Georgia who often seek non-public information for purposes of their investigations and/or joint investigations with those entities. Some of those authorities include the Federal Bureau of Investigation, the Georgia Bureau of Investigation, Sheriffs'

Offices within and outside Georgia, Securities Divisions of other states, Securities and Exchange Commission, and local District Attorneys.

**Coffee County initial investigation**

6.    Coffee County had three separate complaints investigated by the Secretary's office after the 2020 election, all under the designation SEB 2020-250 (Coffee County).

7.    First, on December 4, 2020, Coffee County advised they were not going to certify their electronic recount numbers, blaming the Dominion system for creating inaccurate election results. Second, the then-Coffee County elections supervisor, Misty Martin (also referred to as Misty Hampton) posted a video on YouTube showing ways she said the elections software could be manipulated and exposing the password of the EMS. Third, a voter submitted a request for an absentee ballot but did not receive it until 25 days later.

8.    After investigation, the office concluded that Ms. Martin failed to keep ballots in batches, failed to follow training she received about the operation of the scanner, and that the video she created was misleading and designed to create doubt and mistrust in the Dominion voting system. The investigation also revealed that Ms. Martin also failed to follow SEB rules regarding the locking of doors to the room where the EMS was located, even though the office itself was locked from the public, and securing the password.

9.     Ms. Martin was removed as supervisor while the investigation was pending and the case was bound over to the Attorney General's office.

**Allegations after the 2020 elections**

10.     After the 2020 presidential election, Scott Hall made a number of allegations about the administration of elections in Georgia.

11.     For example, he signed a sworn affidavit filed in *Wood v. Raffensperger*, Case No. 1:20-cv-04651-SDG (N. D. Ga.) on November 17, 2020, alleging that he observed ballots "giving the impression that they were never folded into an envelope and mailed" and that those ballots "appeared to be pre-printed with the selections already made." *Wood* Doc. 6-18 at ¶ 3. He also alleged that ballots were bubbled in "perfectly" and that "[h]undreds of ballots at a time were counted for Biden only." *Id.* He also made allegations about the setup of tables and a bag in an area that he said was not visible to security cameras. *Wood* Doc. 6-18 at ¶ 4.

12.     The next month, Mr. Hall testified to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee on December 3, 2020 along with Russell Ramsland, Phil Waldron, and Suzie Voyles. During the hearing, Mr. Hall testified that "the referee [referring to Dominion] got paid off to call the game," that he "was told to leave the World Congress Center" after trying to photograph what he said were unsecured bag of ballots, and

again discussed the ballots he believed were "machined-produced" and "pristine." *See* Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, pp. 6–7, 11 (Dec. 30, 2020), *available at* http://www.senatorligon.com/THE_SENATE%20JUDICIARY%20SUBCOMMITTEE_FINAL%20REPORT.PDF

13.    In mid-March 2022, well after SEB 2020-250 was bound over to the Attorney General's office, I was provided a recording of a phone call with Mr. Hall by the Secretary's outside counsel in the *Curling* case.

14.    On that call, Mr. Hall and Marilyn Marks, the director of the Coalition for Good Governance, discuss a variety of topics, including claims by Mr. Hall that the fact that a Dominion employee was from Nigeria was suspicious, given his beliefs about the history of Nigerians engaging in credit card fraud and internet computer hacks, then tying that to Dominion covering up information with Nigerians through contracts with counties.

15.    Mr. Hall also found it suspicious that a Dominion employee whom he described as a young Hispanic lady was "roaming around" in Fulton County and "disappeared" after he mentioned Dominion's home office in Colorado to her.

16.    After saying he didn't believe anyone in Fulton County about elections, claiming they threw away ballots—and almost an hour into the call—

5

Mr. Hall mentions in passing that he chartered "a jet" to go to Coffee County to "scan every freaking ballot." He then said that no one had issued a report, despite the same people going to Michigan had "scanned all the equipment" and "every single ballot" and that Mr. Hall had gotten no feedback from the team.

17.    He then claimed Ms. Martin showed him where her daughter watched Netflix on the Coffee County Poll Pads.

18.    The total time where Coffee County is being discussed in the one hour, 22 minute, and 55 second call constitutes about three minutes.

19.    The recording had not been turned over to our lawyers or to the Secretary's office prior to March 2022 and the Secretary's office was not on notice of Mr. Hall's allegations until receiving the recording.

20.    Based on filings in this case regarding that recording and testimony from a "Cyber Ninja" that he reviewed both the Coffee County and Fulton County election software, we have also received complaints that Fulton County elections was "breached."

**Re-Opening the Coffee County investigation**

21.    After reviewing the recording and discussing with our lawyers in this case, I asked our Investigations Division to open an investigation into the

allegation that Mr. Hall told Ms. Marks regarding Coffee County. That was also in mid-March, 2022.

22.   Given the type of allegations and the fact that the person asserting these claims had made many other allegations that were not factually supported regarding the 2020 election, our office determined to first undertake a forensic evaluation of the server at issue to see what information could be gathered by that route.

23.   We first contacted Dominion to see if they could assist us gain access to the server to conduct a forensic investigation in or around March 25, 2022. Despite involving Dominion engineering staff, Dominion was ultimately unable to gain access to the server.

24.   In and around the same time period, I was also having discussions with Coffee County's attorneys. They were aware of the allegations by Mr. Hall and had been looking into them as well.

25.   Because we believed that a forensic evaluation would greatly assist in determining truth from falsity in these claims prior to interviewing witnesses (some of whom who have made numerous allegations regarding the 2020 election in Georgia that have not turned out to be supported by the facts), we determined that we would bring in the consulting expert in this case to assist in the forensic inspection of the server. Without disclosing investigative

sources and methods, that investigation has been fruitful and I believe the information gathered will assist our investigators as they interview witnesses and gather other relevant information.

26.     Despite this process beginning in mid-March 2022, on or around April 24, 2022, it was brought to my attention that a case file had not been created in our investigations tracking system even though the investigation was ongoing, and I had requested one to be opened. I believe this occurred because the Deputy Chief Investigator whom I had asked to open the investigation left our office shortly after the request was made and did not complete the tracking system update prior to leaving. When I learned the tracking system had not been updated as requested, I asked the current Deputy Chief Investigator to document the re-opening of the investigations aspect of SEB 2020-250 (Coffee County) because the new allegations seemed related to that existing case. That occurred on April 25, 2022.

27.     The investigation into Coffee County has been re-opened since March 14, 2022 and remains ongoing.

28.     Our next steps are to complete the forensic investigation and to interview witnesses.

29.     Based on our investigation so far, we have also asked the Georgia Bureau of Investigation (GBI) to assist with the investigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

_3/2/22_
Date

C. Ryan Germany
Office of the Georgia Secretary of State

**Exhibit 7**

# EXHIBIT 77

1

2

3

4

5   SELECT COMMITTEE TO INVESTIGATE THE

6   JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7   U.S. HOUSE OF REPRESENTATIVES,

8   WASHINGTON, D.C.

9

10

11

12   INTERVIEW OF:     BRAD RAFFENSPERGER

13

14

15

16                                     Tuesday, November 30, 2021

17

18                                     Washington, D.C.

19

20

21          The interview in the above matter was held in Room 4480, O'Neill House Office

22   Building, commencing at 10:01 a.m.

23          Present:     Representatives Schiff, Lofgren, Raskin, Aguilar, Cheney, and Kinzinger.

1

2      Appearances:

3

4

5

6      For the SELECT COMMITTEE TO INVESTIGATE

7      THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

8      ████████         CHIEF INVESTIGATIVE COUNSEL

9      ████████           PROFESSIONAL STAFF

10     ████████       CHIEF CLERK

11     ████████       INVESTIGATIVE COUNSEL

12     ████████     SENIOR INVESTIGATIVE COUNSEL

13     AND OF COUNSEL TO THE VICE CHAIR

14     ████████   DETAILEE

15     ████████        STAFF ASSOCIATE

16     ████████     CHIEF ADMINISTRATIVE OFFICER

17     ████████       RESEARCHER

18

19     For the OFFICE OF GEORGIA SECRETARY OF STATE:

20     JACKSON R. SHARMAN, III

21     ROBERT JAY SEWELL

22     GIL HUMES, SECURITY FOR MR. RAFFENSPERGER

1                                 EXAMINATION

2                    BY ▇▇▇▇▇ :

3          Q    You are currently the secretary of state of Georgia, correct?

4          A    Correct.

5          Q    And when did you get sworn into that position?

6          A    January 2019.

7          Q    And when does your current term end?

8          A    January 2023.

9          Q    And you're also a licensed professional engineer?

10         A    Correct.

11         Q    Okay.    And are you also currently the owner and CEO of Tendon Systems?

12         A    Yes.

13         Q    And how long have you had that position?

14         A    Since its inception.

15         Q    Which was roughly when?

16         A    Roughly 2007.

17         Q    Okay.    Could you just in very general terms describe what the roles and

18   responsibilities are for the secretary of state in Georgia?

19         A    The secretary of state is charged with oversight for corporations, securities,

20   charities, and professional licensing, and then obviously elections.    And then we have

21   some organizations that are administratively attached to us, but we don't have really

22   oversight of those.

23         Q    Okay.    And we'll be focusing today obviously on your election

24   responsibilities.    And in regard to elections, what are -- what could have been some of

25   your priorities as secretary of state regarding elections?

1          A       When I took office in January 2019, number one is to secure new voting

2   machines with a verifiable paper ballot due to a court order that we could not use the old

3   DRE machines anymore.     And then part of that was to be able to join the Electronic

4   Registration Information Center so we could update voter rolls objectively.

5          Q       Okay.    So can you -- I know you're an engineer, but in layman's terms, can

6   you sort of describe, with regard to the November 2020 election in particular, how the

7   mechanics of voting worked both for in-person voting, and then, secondly, for absentee

8   ballots?

9          So if you're a typical voter, you go in.    Just describe for us what the machine is

10   like and what a voter would do.

11          A       So if you showed up to vote in the fall election of 2020, we had the new

12   verifiable paper ballot.    So if you showed up to vote, you would, first of all, have a new

13   poll pad.    And the poll pad is not connected to any other piece of equipment, but they're

14   really to sign you in.    And then you would get your little card, which now has been

15   activated, which then you walk over several steps to the ballot marking device.

16          The ballot marking device was a machine that does not record any information,

17   but, in effect, will show you all the selections on the screen.    It looked like a giant 11 by

18   17 iPad, so to speak.    You made all your selections, verified your selections.    And then

19   you could go ahead, once you verified your selections, print the ballot.

20          Then that machine, in effect, was just to print the ballot.    It was not connected to

21   the internet or anything else like that.

22          You then would have your paper ballot.    You could review your paper ballot.

23   You walk that over to the scanner, put that on the scanner, and then press the button,

24   and that's when your ballot would be scanned.

25          Q       And then what happens after that?

18

1          Q     Okay.    So in advance of the November 3rd, 2020, election, the Trump

2     campaign did not complain about any allegations of fraud or failure to follow State law or

3     anything like that?

4          A     Not that I recall.

5          ███████     I'll pause here.

6               ████████     Yeah, just a couple followups.

7               BY ████████ :

8          Q     You said something earlier, Mr. Secretary, about no-excuse absentee ballot.

9     Do I correctly understand that to mean the voter didn't need a reason, didn't need an

10    illness or a professional commitment to get an absentee ballot, he or she could get

11    it regardless?

12         A     Correct.    That's current State law.

13         Q     Okay.    And that, is that a change from the way it used to be, or has it

14    always been that way?

15         A     It's always been that since it was put into effect in 2005.    It was signed into

16    law by Governor Sonny Perdue.

17         Q     I see.    So a voter had three options, either an absentee ballot without

18    necessary -- necessarily having a reason, an early in-person vote, or just like the

19    old-fashioned way, going to a polling place on election day.

20         A     Correct.

21         Q     I see.    But all three of those ballots -- each three of those choices generated

22    a paper ballot for that voter.

23         A     Correct.

24         Q     And it went through one of those scanning machines.

25         A     Correct.

1        Q     I see.    So every ballot in the State of Georgia, regardless of the mode of

2   transmission, generated a paper record and went through one of the same kinds of

3   machines?

4        A     Correct.

5        Q     And it sounds like what you said earlier is that those machines were new

6   after the 2018 election.

7        A     Yes.

8        Q     You replaced the old ones that didn't generate a paper ballot with new ones

9   that did.    Is that right?

10       A     Correct.    It was the fastest and the largest implementation of new voting

11   machines in the entire country.

12       Q     Yeah.    And that was true, Mr. Secretary, across the State, every county --

13       A     Every single county had new machines --

14       Q     Okay.

15       A     -- purchased by the State of Georgia.

16       Q     Purchased by the State.    I see.    So it sounds to me like whatever

17   happened in 2018 and the litigation that resulted made the 2020 election a lot more

18   secure, in your view.

19       A     Having a verifiable paper ballot is one of the best implementations that

20   every State could make, and we made it in Georgia.

21       Q     And just tell us generally why that makes it more reliable or safer, having a

22   generated paper ballot for each voter.

23       A     Because if you want to do a 100 percent hand recount, you now have a piece

24   of paper that you can hand recount.    With using the old DRE machines, all you could do

25   was press the button and you would get the same answer.

Case 1:17-cv-02989-AT   Document 1630-27   Filed 02/13/23   Page 8 of 11
USCA11 Case: 23-14115   Document: 19   Date Filed: 12/29/2023   Page: 125 of 175

Case 1:17-cv-02989-AT   Document 1551-1   Filed 12/28/22   Page 21 of 149

20

1        Q     I see.

2        A     But this way, you could verify through the paper who people voted for.

3        Q     Got it.   So you've got the machine flash drive electronic counts, but then

4   you have a fail-safe, which is the actual paper ballots that could be hand recounted.

5        A     Correct.

6        Q     And that's new for 2020, didn't exist prior to that back in your election in

7   2018 or prior election.

8        A     Correct.

9        Q     Okay.

10             BY ▆▆▆▆▆▆ :

11        Q     Could you tell us a little bit about the process of selecting Dominion with

12   their RFP process?   How did that work?

13        A     We had an RFP process.   We were on a fast track because we had to get

14   this in place for the first election, the Presidential primary of 2020, because of court

15   order.

16             So we began the RFP process.   It was a five-member team.   We had someone

17   from the disability community.   We had someone from the tech community so we could

18   look at the tech basis.   My deputy secretary of state was on that committee, and we had

19   two other individuals.   I was not on that.

20             They went through a point system, and they evaluated companies on qualitative

21   and quantitative.   Qualitative accounted for 75 percent of the score.   Quantitative,

22   which was price, counted for 25 percent of the score.

23             Dominion scored very strongly on the price.   They're much more economical

24   than the other systems.   On the qualitative, they were close to another one, but there

25   was another company.   But when you added it all up, Dominion was the low apparent

Case 1:17-cv-02989-AT    Document 1630-27    Filed 02/13/23    Page 9 of 11
USCA11 Case: 23-14115    Document: 19    Date Filed: 12/29/2023    Page: 126 of 175

Case 1:17-cv-02989-AT    Document 1551-1    Filed 12/28/22    Page 59 of 149
58

1    get together for meetings and have conversations.    So we look at best practices, and we

2    see what other States are doing.

3        Q    And, if another State had found widespread problems with Dominion Voting

4    Systems, do you think they would've brought that to your attention?

5        A    I think the entire world would've brought that to our attention.

6        Q    Okay.    Did you talk to secretaries of state from other States regarding

7    Dominion Voting Systems?

8        A    Not really so much.    Kyle Ardoin is secretary of state of Louisiana; they use

9    Dominion.    He's now the president of NAS, the National Association of Secretaries of

10    State.    And so he faced some of these same issues that we did about the reliability of the

11    machines, even though that State went, you know, 60/40 for President Trump.

12        Q    Did he say whether he looked into those issues and, if so, what he found?

13        A    No, I don't recall that, anything specific.

14        Q    But I assume he did not say anything that would cause you to have --

15        A    No.

16        Q    -- a lack of confidence in Dominion?

17        A    Correct.

18        Q    And I know you've covered some of this before, but are the Dominion Voting

19    Systems machines used in Georgia connected to the internet?

20        A    No, they are not.

21        Q    Okay.

22        ███████    To follow up on that, you said, Secretary Raffensperger, that they

23    generate data onto a flash drive that is specific to that machine?

24        Mr. Raffensperger.    Right.

25        ███████    They're not connected to each other or to some central source?

1          Mr. Raffensperger.   Right.   It's really just, you have two flash drives so that you

2    have two sources.    In case something happened to a flash drive, you'd always have a

3    backup.

4          ████████.   Yeah.

5                 BY████████

6          Q    And could anybody have tampered with those flash drives?

7          A    No.

8          Q    I mean, is it something where somebody could've come in and switched out

9    the flash drives?

10         A    There would be a record of that on the forensic back end.    And we did a

11   forensic audit of the -- Pro V&V did a forensic audit of a sample size of the machines

12   post-election.

13         Q    And then, in addition to that, having the two flash drives for the machine, as

14   you said earlier, there's then, of course, the paper record, which is the most reliable of all.

15         A    Correct.

16         ███████████    So they're really more like a calculator than a computer.    In other

17   words --

18         Mr. Raffensperger.   Correct.

19         ██████████    -- they sort of tabulate stuff just within that individual box, that

20   machine, but do not, like a computer, connect to other boxes or other machines.

21         Mr. Raffensperger.   Correct.   It's an adding machine.

22         █████████   Yeah.

23                 BY████████

24         Q    Is there any way that they could be hacked?

25         A    They haven't been.

Case 1:17-cv-02989-AT   Document 1630-27   Filed 02/13/23   Page 11 of 11
USCA11 Case: 23-14115   Document: 19   Date Filed: 12/29/2023   Page: 128 of 175

Case 1:17-cv-02989-AT   Document 1551-1   Filed 12/28/22   Page 61 of 149

60

1    Q    I mean, if they're not connected to the internet --

2    A    They're not connected to the internet.

3    Q    -- is there any way that you can think of where that could happen, where

4    they could be hacked?

5    A    The machines are secured, and they're always, you know, identified that you

6    have security, you know, tape on it, you know, so that you know that, if you broke it,

7    broke the seal, that someone could've been in there.   And so there was never any

8    evidence of that that we are aware of.

9    Q    Okay.

10                   Any members have questions so far?

11   Mr. <u>Schiff.</u>   I do not.   Thank you.

12                   Great.

13                 BY

14   Q    So let's turn your attention to exhibit 6 now in your binder.   This one, at the

15   top, it says, "Administration of Donald J. Trump, 2020, Remarks During a Video

16   Teleconference With United States Servicemembers and Exchange With Reporters,

17   November 26, 2020."

18         He says at the beginning, "Happy Thanksgiving," so this appears to be President

19   Trump's Thanksgiving address to servicemembers.   And there were reporters there.

20   There's, you know, a lengthy discussion of, you know, thanking the troops, which I won't

21   cover.

22         But I would turn your attention to page 6, and about three-quarters of the way

23   down the page there's a question.   Question:   "Mr. President, do you have any big

24   plans for your last Thanksgiving at the White House?"

25         You can see, then, the reference to it being the last Thanksgiving at the

**Exhibit 8**

# EXHIBIT 78

Case 1:17-cv-02989-AT Document 1630-29 Filed 02/13/23 Page 2 of 13



(/)

≡

« Return to Transcript Library home (/blog/transcripts)

| Transcript Categories ⇕ | | Search | 🔍 |

Nov 11, 2020

# Georgia Secretary of State Brad Raffensperger Press Conference Transcript: Announces Hand Recount



Rev (https://www.rev.com/) › Blog (https://www.rev.com/blog/) › Transcripts (https://www.rev.com/blog/transcripts) › Georgia Secretary of State Brad Raffensperger Press Conference Transcript: Announces Hand Recount

Georgia Secretary of State Brad Raffensperger announced a full hand recount of the Georgia election in a news briefing on November 11. Read the full transcript of the press conference here.



(https://twitter.com/RevTranscripts)



(https://www.facebook.com/revtranscripts/)

**Transcribe Your Own Content**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

Get Started

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

Get Started

✕

2/10/23, 5:22 AM · Georgia Secretary of State Brad Raffensperger Press Conference Transcript Announces Hand Recount | Rev

Case 1:17-cv-02989-AT Document 1630-28 Filed 02/13/23 Page 3 of 53

USCA11 Case: 23-14115 · Document: 19 · Date Filed: 12/29/2023 · Page: 132 of 175

**Brad Raffensperger: ([00:04 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=4.64)](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=4.64))**

Okay. Well, good morning, everyone. Today is November 11th. Before we get started in talking about why we're here today, I'd like to just give a heartfelt prayer of thanksgiving to all those that gave their lives for this country, all those people that continue to serve. This is a special day. This is a holiday. Growing up, my dad served in World War II in the Navy, and people were called to serve. And then we had Korea, Vietnam, and the people serving today. And so we can never forget, and we can never give them enough thanks for what they've done for this nation.

**Brad Raffensperger: ([00:56 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=56.34)](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=56.34))**

And one of the things that they fought for is for our right, our freedom to have free and fair elections. So that is, at the end of the day, what we really do need to be mindful of, particularly in our office, as we work finishing up and closing out the election that we just had.

**Brad Raffensperger: ([01:16 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=76.73)](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=76.73))**

Also wanted to give a heartfelt thanks to the men and women who are standing with me here today. These are election directors from across Georgia. They represent large counties, small counties, diverse counties, and just from all over the state of Georgia. They and their staff are the ones that do the hard work on the ground of making sure that all legal votes will be counted. Their job is hard. They executed their responsibilities, and they did their job.

**Brad Raffensperger: ([01:52 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=112.88)](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=112.88))**

This is a process. It is a process defined by law. These men and women in my office will continue to follow the law and count every legal vote. As it stands today, 97 counties have sent them the final numbers in. The current margin stands at 14,101, between the President and Senator Biden, Vice President Biden. My office will continue to investigate each and every instance of illegal voting, double voting, felon voting, people voting out of state. If you report it, we will investigate it. Every legal vote will count. We will continue to follow and enforce the law.

**Brad Raffensperger: ([02:43 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=163.9)](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=163.9))**

Now let's look at the next steps. We are currently looking at having a statewide runoff on December 1 and another on January 5th. This is an untenable situation for these men and women to try and run both of these elections. With that, under my powers under health emergency, I am moving the date of the December 1st election to coincide with the federal run-off on January 5th. This will protect the integrity of both elections and make for better election administration. It has the added benefit of saving taxpayers millions of dollars. The reason we have so many of these on rollover lists voters is a direct function of COVID. This is the reality.

**Brad Raffensperger: ([03:32 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?))**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

so close, it will require a full by hand recount in each county. This will help build confidence it will be an audit, a recount and a recanvas all at once. It will be a heavy lift, but we will work with the counties to get this done in time for our state certification.

**Brad Raffensperger: (04:15 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=255.62))**

Many of these workers will be working plenty of overtime. We have all worked hard to bring fair and accurate counts to assure that the will of the voters is reflected in the final count, and that every voter will have confidence in the outcome, whether their candidate won or lost. Thank you for coming today. Do we have any questions?

**Audience: (04:41 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=281.78))**

**Brad Raffensperger: (04:50 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=290.06))**

Well, because we now have that verifiable paper ballot, for the first time in 18 years, we're going to have something to count instead of just pressing a button and getting the same answer. So we'll be counting every single piece of paper, every single ballot, every single lawfully cast legal ballot.

**Audience: (05:06 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=306.91))**

Does that mean a QR code or-

**Brad Raffensperger: (05:08 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=308.91))**

That will be the names that are on the ballot, whoever they voted for president, the English written word.

**Brad Raffensperger: (05:18 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=318.41))**

Yes, we will. As I said, people will be working lots of overtime the next coming week. Lot of people will be really pleased with those paychecks if they're getting overtime.

**Audience: (05:31 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=331.74))**

Secretary, will the recount be invested on how many election voters it will take to do that? Is there also going to be a cost? Is that a lot of money, state or federal fund?

**Brad Raffensperger: (05:36 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=336.78))**

That'll be coming out of, we'll determine at some point adding additional workers. We will probably have to augment that, and we'll be looking at that. And that'll be the election directors at each county will be able to, they'll actually handle their own additional or their own county recount or risk-limiting audit county by county.

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Audience: (06:00 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=360.5))**

Is this how this audit was designed to work? I thought, originally, it was supposed to be looking at a small segment of the vote, not the larger picture.

**Brad Raffensperger: (06:05 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=365.35))**

Yeah. Well, that's really interesting when you start really digging into probability theorem. When you have 5 million votes, and the margin is so close, 14,000, if we pulled out 10,000 votes, all of a sudden, it could say, well, this is the person that won. We pull out a hundred thousand, it says this person won. We pull out a million, this person won. And that's why, mathematically, you actually have to do a full hand by hand recount of all, because the margin is so close. Right now it's 14,101. So it's really just the mathematics, the statistics, the probability theorems that we use for the risk limiting that are taking us to that step.

**Brad Raffensperger: (06:40 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=400.75))**

So if it was another race, or you didn't have such a close thing, then you could do that, and it would just be a sample size. But you can't do that when it's that close. This race has national significance, national importance. We get that. We understand that.

**Audience: (06:56 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=416.04))**

Does the Trump administration-

**Brad Raffensperger: (06:57 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=417.43))**

We do, we follow the process, and we understand the significance of this, for not just Georgia, but for every single American. At the end of the day, when we do a hand count, then we can answer the question, exactly what was the final margin in this race? Yes, ma'am?

**Audience: (07:24 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=444.67))**

The President just released a list of some Georgians who had passed away who supposedly voted in this election. Is that something you will look into?

**Brad Raffensperger: (07:26 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=446.16))**

Oh, absolutely. We've been open and transparent. In fact, we've had multiple meetings like this, meeting with the press. Gabriel Sterling, our implementation manager has come out to talk to you, really digging into the weeds. If you have any information about illegal voting or voter fraud, bring that to our attention. We will investigate every case that we hear.

**Audience: (07:48 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Brad Raffensperger: (07:52 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=472.99))**

I'm hearing that that just came out this morning. We'll look at those records, and we'll start digging into that.

**Audience: (07:58 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=478.14))**

Won't the hand recount be less accurate than a computer recount? Humans make mistakes. And are you concerned about the accuracy of a hand recount?

**Brad Raffensperger: (08:06 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=486.62))**

It really is what the numbers take us to, and we're following the process that would drive to that, that's in current state law.

**Audience: (08:14 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=494.08))**

And is it reasonable to believe that the results will change much? 14,000 votes. Is there any chance that the outcome or the results of the presidential election would change as a result? And is it possible that 14,000 votes could flip?

**Brad Raffensperger: (08:31 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=511.25))**

You're asking me to make predictions, and what we're going to deal is in facts. And so I'll report the facts, and then—

**Audience: (08:36 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=516.01))**

We're talking probablilites. What is the probability?

**Brad Raffensperger: (08:38 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=518.22))**

I'll get out my calculator, and I'll get that back to you. I can't do that off the cuff. Thank you.

**Audience: (08:43 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=523))**

[inaudible 00:08:43] still ask for a recount once this is done. [inaudible 00:08:48].

**Brad Raffensperger: (08:52 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=532.12))**

That's a good question. But after it has certified, the candidate that is within half percent, I believe, would still be entitled to a recount, but that would be a scan recount, just because of that is what is in state law.

**Brad Raffensperger: (09:04 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Audience: (09:04 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=544.97))**

Whap happens if certain counties [inaudible 00:09:08].

**Brad Raffensperger: (09:12 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=552.44))**

We're going to continue to work with the counties on that, but that's their deadline. And that is the process that we have in place. And we've had a great cooperation and dedication from the county election officials. That's why we have so many here. We have professionals out there. And at the end of the day, I know that I haven't asked them, but I know that there's some folks back here that maybe vote this way, and other folks that vote that way, and some go this way, that way on different elections. At the end of the day, though, they're following a process. And then what they want is they never want you to be able to question their integrity. And that's what we want for everyone. They're seeing that we're following a process. Integrity still matters.

**Audience: (09:50 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=590.69))**

[inaudible 00:09:50].

**Brad Raffensperger: (09:50 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=590.72))**

We'll continue with every county that we have, and if there's some they're still buttoning it up, then we'll roll to that. Hopefully that's the smaller counties.

**Audience: (10:00 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=600.47))**

Is there any sort of estimate of how long this will take?

**Brad Raffensperger: (10:04 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=604.63))**

It will take every bit of the time that we have left, for sure. It's a big lift.

**Audience: (10:08 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=608.91))**

So to certify-

**Brad Raffensperger: (10:12 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=612.68))**

Our date is November 20.

**Audience: (10:14 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=614.41))**

You've been saying for more than a year that we should absolutely trust the QR codes. So why is a hand

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

statistically because of where we are, here, we have a team of people, national experts that have worked on risk limiting audits in several other states. They're part of our team. This not just a decision we made unilaterally. We reached out to these experts. We've been working with them for several months, and we just follow the science of the risk limiting audit. We follow the numbers, and that's where it leads us, to count every single ballot by hand.

**Audience: (10:45 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=645.88))**

Does this mean that certification deadlines are no longer in effect or extended to November 20?

**Brad Raffensperger: (10:51 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=651.26))**

No, they're still required, and we want them here by Friday at the latest. We have 97 counties already.

**Audience: (11:02 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=662.54))**

Can the recount begin before the county is certified? [inaudible 00:11:03] What's the-

**Brad Raffensperger: (11:02 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=662.97))**

I'll talk to legal about that, but we want to start this really before the week is up because we understand there's an awful lot to do. Yes sir?

**Audience: (11:10 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=670.94))**

This is a little repetitive. Could you elaborate again on the timeline of the audit, and what is going to be counted exactly?

**Brad Raffensperger: (11:17 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=677.55))**

The ballot that you had, whether it was an absentee ballot, if you sent that in, or if it was voted by in-person like I did, we'll look at that ballot. And someone's going to look at who did you want, and they're just going to go through that. And you'll have two people that are doing all the counting. They'll put them out and in stacks and make sure that the stack has, let's say, a thousand ballots. And then you look at the end, you had 501 for this person, 499 for that one. You just keep on rolling through. And that's how it's going to be, all the way through. And you're going to tally it all up. It's a big process. There will be a methodical process. It'll be an accurate process. And I'm sure that there will be plenty of oversight. We want to make sure that both parties have the opportunity to observe this because we understand the stakes are high.

**Brad Raffensperger: (12:07 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=727.2))**

I don't really know. And we do what we do in Georgia. We follow our laws. And every state is 50 states, 50 different election laws.

**Audience: (12:13 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Brad Raffensperger:** (12:18 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=738.83))

No, that would then become the risk limiting audit and becomes a full recount. And that is what we are going to be certifying on November 20th. So thank you very much.

**Audience:** (12:28 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=748))

[inaudible 00:12:28] will be certified.

**Brad Raffensperger:** (12:30 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=750.05))

That'll be what we've certified because that'll be the last count, and that'd be the most accurate count. That'll be the paper ballot count.

**Audience:** (12:33 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=753.9))

This bypasses the audit, I guess, in theory.

**Brad Raffensperger:** (12:36 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=756.61))

Well, it is actually an audit. It's all in one. It's an audit, recanvas and a recount, all in one, because it'll be just really a process that gets it all.

**Audience:** (12:44 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=764.22))

Secretary?

**Brad Raffensperger:** (12:45 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=765.58))

Yeah.

**Audience:** (12:46 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=766.88))

When will the election [inaudible 00:12:48] It's going to take [inaudible 00:12:51] to certify these, go through all these. [inaudible 00:12:55].

**Brad Raffensperger:** (12:59 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=779.67))

Well, many people aren't aware of is that where we are in the process right now in our county, we're in the same place that Florida is, North Carolina and Texas. The thing is, in those races, it's not real close. In our case, there's 14,101 votes right now that separate the top versus number two. And so therefore, all eyes have focused on that. And that's really why you're seeing that. But the other states are still out there tabulating their absentee ballots. Thank you for bringing that up.

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

[inaudible 00:13:30].

**Brad Raffensperger: (13:32 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=812.75))**

That's still going on.

**Audience: (13:34 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=814.37))**

But even though someone will have been sworn in for that seat, [inaudible 00:13:38] already have been sworn in by the time the special election takes place.

**Brad Raffensperger: (13:42 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=822.05))**

The fifth district is not affected by what we're doing here.

**Audience: (13:44 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=824.2))**

Secretary, as you know, [inaudible 00:13:46] at the parties say that a lot of Republican voters and Trump supporters in particular, do not trust the election results. It's not the matching the person to the computer scan. It's the dead people vote. Did the mail service, did employees from the postal service steal the election? And how can you remedy that in counting the votes? Are you going to call the person who voted and ask, did you vote for this person. Is this person alive in your family? How do you remedy those accusation? How do you get to the bottom of that?

**Brad Raffensperger: (14:22 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=862.51))**

Well, number one, I am not the Postmaster General. We have no control over the Federal Postal Service. So when people mailed their ballots back, it's under federal government control and the Federal Post Office, Postal Service. Once it gets to the counties, then that's on the counties how to handle that. Through this process, we believe that, and we know that the machines are correct, and what you're going to find, we believe in the count. As relates to dead people and other forms of illegal voting, that's why we've asked for, if you know, of a case of illegal voting or suspected illegal voting, bring that to us. Antidotes and stories doesn't work. We need something that we can actually investigate. I'm actually very grateful that Attorney General Barr, I respect that man, this is second round as being Attorney General of the United States of America. And he is a calm, very thorough attorney. And he's directed his US attorneys to look for things. And the one thing that federal government does have is resources that we don't have. And so if they can find something that we can't, that can help to bring to bear, we want to make sure that the only people that vote are legal voters.

**Audience: (15:37 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=937.52))**

That's not part of this process that [inaudible 00:15:41].

**Brad Raffensperger: (15:41 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=941.56))**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Brad Raffensperger: (15:50 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=950.63)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=950.63) [loadFrom=PastedDeeplink&ts=950.63](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=950.63))**

No, we can pick whatever one we pick, but we understand the national significance of this session right now. Next time it may be some other statewide race. And in fact, as we rolled this out, you have to understand, many states that are doing risk limiting audit, it took them five to seven years to get this going. When Colorado did it, that was a long multi-year process. We've passed House Bill H.B. 316 in 2019. We stood up, in spite of COVID, a risk limiting audit this year, and so at nine months, 11 months, we're going to do the first statewide election with a risk limiting audit. So this is record time that we've done this. We actually eventually are going to be doing risk limiting audits for a host of elections to give you the voter confidence that when you've cast your ballot, it was accurately counted, that you have the confidence, and you can leave at the end of the day, knowing the system got it right. And then when we do that, we think it really is good for all of Georgia.

**Audience: (16:46 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1006.49)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1006.49) [loadFrom=PastedDeeplink&ts=1006.49](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1006.49))**

Are you doing this whole recount because the Trump campaign asked you to?

**Brad Raffensperger: (16:49 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1009.54)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1009.54) [loadFrom=PastedDeeplink&ts=1009.54](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1009.54))**

No, we're doing this because it is really what makes the most sense. With the national significance of this race and the closeness of this race, we have to run a statewide audit. This is the race that makes the most sense, logically, as I worked with our team, this is really what made the most sense. And we'll be following the process on that.

**Audience: (17:06 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1026.18)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1026.18) [loadFrom=PastedDeeplink&ts=1026.18](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1026.18))**

Just a followup. I understand you don't have the total cost. This could mean [inaudible 00:17:09] You said there would be a lot of overtime so it sounds expensive.

**Brad Raffensperger: (17:18 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1038.42)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1038.42) [loadFrom=PastedDeeplink&ts=1038.42](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1038.42))**

Yeah, it is. We understand that typically the counties fund their own elections. And this is part of one of the things that they'd buy into. And right now, everyone's in austerity cuts. So that's the issue. But that's where we are. And I don't have an answer to specific on that. I have my domain as Secretary of State, and I can only have my authority that I have within office. And that is something that would really be what the general assembly perhaps could do to help the counties.

**Audience: (17:44 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1064.77)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1064.77) [loadFrom=PastedDeeplink&ts=1064.77](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1064.77))**

Did I describe it correctly? It sounds like the counties will foot the bill, but there's opportunity possibly-

**Brad Raffensperger: (17:48 ([https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1068)) [IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?](https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?)**

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Audience: (17:52 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1072.17))**

Secretary, you really released this to all, but you bill yourself as a national leader, Georgia as a national leader in elections. Does anything change in that? Or do you still consider yourself a national leader?

**Brad Raffensperger: (18:01 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1081.7))**

Yeah, I think George has done a great job if you look at what we accomplished in this past year. We stood up a new voting system, new voting machines in less than six months. And that was really because we had an activist federal judge that said you can't use the old DRE machines. And so we had to do that for the first primary that we had coming up.

**Brad Raffensperger: (18:20 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1100.75))**

All of a sudden we got hit with COVID that started hitting in February, and then March the general assembly had to take a hiatus around March 15th. And so then we had to do a 360 or a 180 on what are we going to do here so that we can run elections that are safe for voters? And what does that look like?

**Brad Raffensperger: (18:38 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1118.41))**

And then coming out of that, we stood up an absentee ballot portal so that we have safe, secure requests for absentee ballots that required voters to tell us your name, day, month and year so we can identify you. And then also your department of drivers service, your driver's license number. So we making sure it truly is the voter that's requesting this absentee ballot for additional security.

**Brad Raffensperger: (19:01 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1141.82))**

And then we added ballot tracks. Then we added the wait time. And then we had very successful early day voting. We had a few lines the first couple of days, and then we had record 2.8 million voters plus voted in early voting. And we had very short lines for that. State Farm stood up, but across the state, everyone of these election directors had great success.

**Brad Raffensperger: (19:25 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1165.13))**

Then on the day of election, we had an average wait time in the afternoon was about two minutes. At one point, I screenshot it, put it out there on Facebook. We had wait times, the longest wait time was 40 minutes. It dropped down to 20 minutes, and before you know, it was 10 minutes. So tremendous results. And so I think that we've led in so many different areas, and we've proven that every vote counts, and integrity matters. At the end of the day, that's good.

**Audience: (19:50 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1190.13))**

what happens if the recount isn't done by November 20?

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

the one thing that we've learned in the construction industry, I've been in this thing really, at my first construction job site when I was about six years old, sitting in my dad's pickup truck. And so I grew up with the idea of deadlines, and in our business, it is all about deadlines. And every day, it's about hitting deadlines.

**Brad Raffensperger: ([20:17 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1217.65))**

And our election directors, they know all about deadlines because we have this date for this, this date for that, registration, this early vote, day of election. And then all of a sudden, you have a runoff, and then you roll into next year we're going to have city and municipal elections. And then we're going to roll into the next year. So this whole operation is deadline driven.

**Audience: ([20:37 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1237.61))**

I'm just trying to understand how hundreds of human being working long hours are going to be more accurate than a computer.

**Brad Raffensperger: ([20:45 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1245.55))**

Well, that's why there'll be plenty of eyes that can verify that every vote is accurately counted. And that's the way this process works. Because of the large number of voters, and the closeness of the vote, it's the only way to do that. We've talked to our risk-limiting experts in our office and also national experts in that.we're following the process.

**Brad Raffensperger: ([21:07 (https://www.rev.com/transcript-editor/shared/oxX7-PZDDmL-IhU2mPKRirtUNpgqchAksQC3GbvAL5z5FTUdcliK0cjj8n-I4Z7zP7aPFSE0yY8LzZ_NG0gKTc2vWU8?loadFrom=PastedDeeplink&ts=1267.27))**

Thank you very much for coming out. We'll keep you the reasons we got data to share. Thank you.

Other Related Transcripts



**Blinken Meets With Israeli Foreign Minister Transcript**

1 week ago

**Professional Transcription Service**
99% accuracy guaranteed, transcribed by human professionals

**Automatic Transcription Service**
80% accuracy, transcribed by robots and more affordable

**Exhibit 9**

# EXHIBIT 160

Message

| | |
|---|---|
| **From:** | Harvey, Chris [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3F1F603CA29F4E62874AD7949BCD384B-HARVEY, CHR] |
| **Sent:** | 11/6/2020 1:43:58 PM |
| **To:** | Watson, Frances [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a76276f39bdd4942930106c456debca6-Watson, Fra] |
| **Subject:** | RE: |

10-4. I assume you're investigating.

## Chris Harvey
*Elections Director*
**Georgia Secretary of State**

**Main 470-312-2777**
**Cell   404-985-6351**



---

**From:** Watson, Frances <fwatson@sos.ga.gov>
**Sent:** Thursday, November 5, 2020 3:31 PM
**To:** Germany, Ryan <rgermany@sos.ga.gov>; Evans, Blake <bevans@sos.ga.gov>; Harvey, Chris <wharvey@sos.ga.gov>
**Subject:**

Name:  Laura Jones
Phone:  (404) 731-5429
Address:  1379 Middlesex Avenue NE
City:  Atlanta
State:  GA
Zip Code:  30306
County:  Fulton
E-mail: lauramullerjones@gmail.com

> **Exhibit 0004**

Location of Violation:  Temple Emanu El, 1850 Spalding Drive

Description of Violation:  When we opened the large cabinets containing the voting machines, we discovered that most of the voting machines "election database" doors were wide open and not secured with a zip tie with serial number.  Seals were already broken or a zip tie was put on but was not put through the door.  Also, we found two paper ballots on the printer.  We did not scan these ballots.  Our Poll Manager, Kaira Bell, put these on her clipboard.  I don't know where those ended up.  Also, all of the machines are supposed to show "0" ballots cast upon opening.  One of our machines did show 1 ballot had been cast on it.  We did not use this machine, but we did use all the other machines that had the "elections database" door open.  Last but not least, we did not follow the protocol for opening the large cabinets and starting up the machines.  In training, I was instructed that all serial numbers on zip ties on doors were to be compared with the serial numbers written down on a form.  We did not do this.  My Poll Manager said, "I've never seen them not match so we don't need to do this.  I can always check it at the end of the day."  So, we clipped off all the zip ties with serial numbers without checking them for a match.  I also know that the Poll Manager did not check them at

the end of the day because I was given the job of putting zip ties on to close up the machines and the Manager was packing up equipment.  It as disheartening not to see the security measures followed.  Laura Jones 404-731-5429

**Frances Watson**

*Chief Investigator*
*Investigations Division*
*Georgia Secretary of State*
Main: 470-312-2774
Cell: 404-683-3226



STATE-DEFENDANTS-00101461

**Exhibit 10**

# EXHIBIT 162

Message

| | |
|---|---|
| **From:** | Harvey, Chris [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3F1F603CA29F4E62874AD7949BCD384B-HARVEY, CHR] |
| **Sent:** | 11/10/2020 6:41:17 PM |
| **To:** | Watson, Frances [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a76276f39bdd4942930106c456debca6-Watson, Fra] |
| **Subject:** | RE: |

How do we know they let him? The pictures look pretty rough

**Chris Harvey**
*Elections Director*
Georgia Secretary of State

**Main 470-312-2777**
**Cell   404-985-6351**



---

**From:** Watson, Frances <fwatson@sos.ga.gov>
**Sent:** Tuesday, November 10, 2020 12:32 PM
**To:** Evans, Blake <bevans@sos.ga.gov>; Harvey, Chris <wharvey@sos.ga.gov>
**Subject:** FW:

FYI

My additional question is why did they let him take photographs in the poll?

**Frances Watson**
*Chief Investigator*
*Investigations Division*
*Georgia Secretary of State*
Main: 470-312-2774
Cell: 404-683-3226



---

**From:** Hall, Adrick <ahall@sos.ga.gov>
**Sent:** Tuesday, November 10, 2020 12:08 PM
**To:** Watson, Frances <fwatson@sos.ga.gov>
**Subject:** FW:

Exhibit
0005

STATE-DEFENDANTS-00101471

FYI...

**From:** Hall, Adrick <ahall@sos.ga.gov>
**Sent:** Tuesday, November 10, 2020 12:08 PM
**To:** Hall, Adrick <ahall@sos.ga.gov>
**Subject:** RE:

See pics

**From:** Hall, Adrick
**Sent:** Tuesday, November 10, 2020 11:18 AM
**To:** Watson, Frances <fwatson@sos.ga.gov>
**Subject:** RE:

I spoke with Austin and he explained that when he went to vote by Absentee-In-Person, the security seals on the BMDs were broken. He brought it to a poll worker's attention and she went and got a man (possibly a tech) who said they leave them open while the polls are open so they can fix the machines if necessary. He informed Austin that they were sealed when the polling location closed.

Austin said, out of concern, he photographed the BMDs in the front and back to capture the broken seals in pictures. I asked that he send me copies of the photos and he said he would email them to me.

**From:** Watson, Frances <fwatson@sos.ga.gov>
**Sent:** Monday, November 9, 2020 5:55 PM
**To:** Hall, Adrick <ahall@sos.ga.gov>
**Subject:**

Can you call this person and determine what he is reporting. Let me know what you find

Name:  Austin
Phone:  ▇▇▇▇▇▇▇
Address:  -
City:  Hartwell
State:  GA
Zip Code:  30643
County:  Hart
E-mail:  -


Location of Violation:  Hartwell polling place at the library


Description of Violation:  Many voting machines unlocked during the day.

https://twitter.com/0x0090/status/1324666182641864706




**Frances Watson**
*Chief Investigator*

Confidential                                                          STATE-DEFENDANTS-00101472

*Investigations Division*
*Georgia Secretary of State*
Main: 470-312-2774
Cell: 404-683-3226



STATE-DEFENDANTS-00101473

**Exhibit 11**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**CORRECTED JOINT STATEMENT OF ADDITIONAL FACTS IN
SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Table of Contents

A.   DREs Suffered from Serious Vulnerabilities. .................................................1

B.   Logan Lamb Breaches CES in August 2016. ...................................................3

C.   Georgia's GEMS System Was Not Air-Gapped. ............................................9

D.   Multiple Components of Georgia's DRE/GEMs Voting System Were
     Transferred to the Current System.................................................................10

E.   Ballots Produced by Georgia's BMD System are Not Voter-
     Verifiable, Much Less Voter-Verified. ..........................................................21

F.   The July 2021 Halderman Report Identified Numerous Serious
     Vulnerabilities with Georgia's Current BMD System. ..................................40

G.   An Independent Government Cybersecurity Agency Verified Dr.
     Halderman's Findings and Recommended Mitigation Measures. ..................51

H.   Defendants' Experts Never Examined Georgia's Voting Equipment
     and Admit Key Vulnerabilities.......................................................................54

I.   Defendants' Own Cybersecurity Consultant Identified Vulnerabilities. ......58

J.   Georgia's Election System Lacks Sufficient Safeguards to Protect
     Against Demonstrated Cybersecurity Vulnerabilities....................................67

K.   The Coffee County Breach Reveals the Lack of Meaningful
     Safeguards to Protect Georgia's Voting System. ..........................................74

     1.   Election Officials in Coffee County Permitted Unauthorized
          Individuals Access to Georgia's Election System .............................74

     2.   Election Data from Coffee County was Uploaded to the Internet
          and Accessed by Dozens of Unauthorized Individuals......................86

     3.   The Coffee County Breach Poses a Serious Threat to the
          Security of Future Georgia Elections ................................................93

L.   State Defendants Ignored All Indications of the Coffee County
     Breach, until Plaintiffs began to Uncover the Facts......................................98

M.   Georgia's Election System Also Lacks Procedural Safeguards
     Because it is Un-Auditable. ..........................................................................112

i

N.    Curling Plaintiffs are Georgia Electors Who Have Suffered
      Particularized Harm. ....................................................................................117

O.    It is Feasible to Implement a Voting System Using Hand-Marked
      Paper Ballots in Georgia. ...........................................................................131

P.    State Law Requires Fulton County to Conduct Elections and
      Implement the Voting System in Fulton County........................................135

109:1-3, 135:23-136:2; Opp. Ex. 5 at 56-57; *see also* Opp. Ex. 100 (stating that his "ideal voting model is one where voters get to choose BMD or hand marked, where audits happen regularly, and where machines are maximally transparent and use modern security features"); Opp. Ex. 87 at 125:7-12; Opp. Ex. 92 at 2.

102.   The vast majority of U.S. jurisdictions use hand-marked paper ballots ("HMPBs") as the primary method of voting, with BMDs used only for voters who need or request them (e.g., those with certain disabilities).  Dkt. 1131, Halderman Report at ¶ 2; Opp. Ex. 57 ¶ 6; Opp. Ex. 102; Opp. Ex. 103; *see also* Opp. Ex. 104 at 8.

103.   The current consensus among election security experts is that BMDs, such as the Dominion ICX at issue, are not a secure method of voting due to fundamental flaws and that there is no known way of remedying those flaws other than to abandon BMDs except for those voters who cannot mark a paper ballot with a pen.  Opp. Ex. 56 at 45:10-46:5; SMF Ex. 59 ¶¶ 5-6, 22-23, 25, 45, 77; Opp. Ex. 105 at 11:9-13:20, 271:4-272:6; Opp. Ex. 32; Opp. Ex. 33; Opp. Ex. 87 at 42:21-43:4; Dkt. 1589, Feb. 2, 2023 Stark Decl., ¶¶ 6-7, Ex. 5 at 2; Opp. Ex. 96.

**Exhibit 12**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
4
     Donna Curling, et al.,
5
                   Plaintiffs,
6                                      CIVIL ACTION FILE
            vs.
7                                      NO. 1:17-cv-02989-AT
     Brad Raffensberger, et
8    al.,
9                   Defendants.
     ~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12
              VIDEO 30(b)(6) DEPOSITION OF
13                  SECRETARY OF STATE
                        THROUGH
14              ROBERT GABRIEL STERLING
15
16                  October 12, 2022
17                     9:26 a.m.
18
19
            Suite 3250, One Atlantic Center
20              1201 W. Peachtree Street
                   Atlanta, Georgia
21
22
23
24
            S. Julie Friedman, CCR-B-1476
25

```
                                                          Page 2

 1                      APPEARANCES OF COUNSEL
 2    On behalf of the Curling Plaintiffs:
 3         MORRISON & FOERSTER LLP
           DAVID D. CROSS, ESQ.
 4         VERONICA ASCARRUNZ, ESQ. (Via Zoom)
           JENNA CONAWAY, ESQ. (Via Zoom)
 5         HANNAH ELSON, ESQ. (Via Zoom)
           CAROLINE MIDDLETON, ESQ. (Via Zoom)
 6         DONNA PRICE, ESQ. (Via Zoom)
           Suite 900
 7         2100 L Street, NW
           Washington, DC  20037
 8         202.887.8795
           dcross@mofo.com
 9    AND
           KREVOLIN & HORST LLC
10         ADAM M. SPARKS, ESQ.
           HALSEY KNAPP, ESQ.
11         Suite 3250, One Atlantic Center
           1201 W. Peachtree Street NW
12         Atlanta, Georgia  30309
           404.835.8067
13         404.888.9577 Fax
           sparks@khlawfirm.com
14
      On behalf of the Coalition for Good Governance
15       Plaintiffs:
16         BRUCE P. BROWN LAW LLC
           BRUCE PERRIN BROWN, ESQ.
17         MARILYN MARKS, ESQ. (Via Zoom)
           Suite 6
18         1123 Zonolite Road
           Atlanta, Georgia  30306
19         404.386.6856
           bbrown@brucepbrownlaw.com
20
21
22
23
24
25
```

```
                                            Page 3

 1              APPEARANCES OF COUNSEL (CONTINUED)
 2    On behalf of the State Defendants:
 3         TAYLOR ENGLISH DUMA LLP
           BRYAN TYSON, ESQ.
 4         DIANE F. LaROSS, ESQ. (Via Zoom)
           BRYAN F. JACOUTOT, ESQ. (Via Zoom)
 5         Suite 200
           1600 Parkwood Circle
 6         Atlanta, Georgia  30339
           678.336.7228
 7         dlaross@taylorenglish.com
      AND
 8         ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
           ALEXANDER DENTON, ESQ. (Via Zoom)
 9         ANNA EDMONDSON, ESQ. (Via Zoom)
           DANIELLE HERNANDEZ, ESQ. (Via Zoom)
10         CAREY A. MILLER, ESQ. (Via Zoom)
           JAVIER PICO-PRATS, ESQ. (Via Zoom)
11         VINCENT R. RUSSO, ESQ. (Via Zoom)
           500 14th Street NW
12         Atlanta, GA  30318
           678.701.9381
13         cmiller@robbinsfirm.com
14
      Also Present:
15         Duncan Buell
           Donna Curling
16         Susan Greenhalgh
           Joseph Oluwasegun
17         Kevin Skoglund
           Danielle Stucchi, Paralegal
18          Krevolin & Horst LLC
           Ernestine Thomas-Clark
19         Scott Bridwell, Videographer
20
21
22
23
24
25
```

Page 4

1                    INDEX OF EXAMINATIONS
2    WITNESS:
     Robert Gabriel Sterling
3                                                   Page
4     CROSS-EXAMINATION                              11
      By Mr. Cross
5
      CROSS-EXAMINATION                             361
6     By Mr. Brown
7
                     INDEX TO EXHIBITS
8
9      Exhibit        Description        Page
10     Exhibit 1    10-10-22 PLAINTIFFS' SEVENTH      12
                    AMENDED NOTICE OF  DEPOSITION OF
11                  OFFICE OF THE SECRETARY OF STATE
12     Exhibit 2    9-28-21 Report of Investigation   28
                    by Blanchard, SEB2020-250,
13                  CONFIDENTIAL, SOS-INV000136-143
14     Exhibit 3    Photograph from YouTube Video of  39
                    Post-it with Password
15
       Exhibit 4    Series of Tweets Beginning with   46
16                  3:51 PM Tweet by Sterling
                    Responding to Adida's Tweet
17
       Exhibit 5    2/10 Transcript of Secretary      51
18                  Raffensperger Interview labeled
                    "APC Raffensperger 20122
19
       Exhibit 6    Still Photo from The Carter        62
20                  Center, Restoring Confidence in
                    American Elections Panel 3 (April
21                  29, 2022), YouTube (May 9, 2022),
                    with a Quote from Sterling
22
       Exhibit 7    E-mail Chain Ending with Tuesday,  77
23                  5-11-21 4:25 PM E-mail, from
                    Watson, to Jones, Subject: Re:
24                  Coffee County, ATTORNEYS EYES
                    ONLY, SOS-INV000007-8
25

Page 13

1      A.    Yes.  I just took it.

2      Q.    Yeah.  And is there any reason you cannot

3  give full and complete testimony today?

4      A.    Not that I'm aware of.

5      Q.    Okay.  And have you ever been convicted of

6  or charged with any crime?

7      A.    No.

8      Q.    Okay.  All right.  Take a look --

9      A.    Wait.  Do speeding tickets count?

10     Q.    No.

11     A.    Okay.

12     Q.    Those are not crimes.

13           Take a look at Exhibit 1, if you would,

14  and turn to Page A-4 where it says, "AMENDED TOPICS."

15     A.    Yes, sir.

16     Q.    And you'll see that there's a topic there,

17  No. 1; and it continues on to the top of the next

18  page.

19           And are you prepared to testify to the

20  knowledge of the Secretary's Office on that topic

21  today?

22     A.    Yes.

23     Q.    Okay.  Now what did you do to prepare for

24  your testimony today?

25     A.    Interviewed several individuals in the

Page 14

1    office and -- or -- and people who also left the

2    office.  Pam Jones left the office.  Chris Harvey's

3    left the office.  Frances Watson has left the office,

4    but I did --  I did interview all of them.

5            The current director in this investigation

6    is our chief investigator, Sara Koth.  Josh --  Oh,

7    what's the last name?  Can't think of it.  One of our

8    other investigators who was the main person on the

9    ground.  Blanchard, that's the last name.

10            Let's see.  Blake.  Talked to Blake Evans.

11            Conferred with counsel.

12            Read over my former -- what do you call

13   it -- deposition.  I read through Chris Harvey's

14   deposition.

15            I reviewed other documents, including

16   things from a Channel 11 interview, the video from

17   The Carter Center.

18            Let's see who else did I interview with.

19   Ryan Germany in my office.  I might have said that

20   already.  I apologize.

21            And generally reviewed my own memory of

22   some of the stuff since this took place over the last

23   two years, and I was in a position to really be aware

24   of or be a part of the decision making process on

25   most of these -- the situation surrounding Coffee

Page 15

1    County and any of the other potential items that

2    might have been -- where access might have been

3    improperly given to somebody or allegation of -- of

4    that kind.

5              And I probably spent -- I --  I couldn't

6    even put a number to how many hours.  I think

7    probably about three weeks' worth of time, depending

8    on my own time, doing it and doing the interviews and

9    doing research and re-reviewing the documentation.

10        Q.    Did you review any documents beyond your

11   prior deposition testimony and Mr. Harvey's

12   deposition testimony?

13        A.    Yes.

14        Q.    What other docs?

15        A.    Should I repeat the ones I already stated

16   or --

17        Q.    No.  The only thing I heard from documents

18   was those two --

19        A.    I also --

20        Q.    -- last --

21        A.    -- looked at the transcript of the Channel

22   11 interview.

23        Q.    Oh, the Channel 11.  Okay.

24        A.    I looked at the video or part of the video

25   from my thing at The Carter Center.

**Exhibit 13**

REDACTED VERSION

# Security Analysis of Georgia's ImageCast X Ballot Marking Devices

Expert Report Submitted on Behalf of Plaintiffs Donna Curling, et al.
*Curling v. Raffensperger*, Civil Action No. 1:17-CV-2989-AT
U.S. District Court for the Northern District of Georgia, Atlanta Division

Prof. J. Alex Halderman, Ph.D.

With the assistance of Prof. Drew Springall, Ph.D.

July 1, 2021

# Contents

1 Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
   1.1 Principal Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
   1.2 Main Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
   1.3 Organization of this Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
2 Georgia's Voting Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
   2.1 Certification and Testing History . . . . . . . . . . . . . . . . . . . . . . . . .   9
   2.2 ImageCast X Hardware and Software . . . . . . . . . . . . . . . . . . . . . .   9
   2.3 ImageCast Precinct Hardware and Software . . . . . . . . . . . . . . . . . .  11
3 Threats to Georgia Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
   3.1 Threat Actors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
   3.2 BMD Ballot Manipulation Attacks . . . . . . . . . . . . . . . . . . . . . . . .  13
4 Methodology and Testing Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
   4.1 Testing Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
   4.2 Materials Examined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
   4.3 Testing Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
   4.4 Proof-of-Concept Attacks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
5 Manipulating Ballots via the ICX Printer . . . . . . . . . . . . . . . . . . . . . . . .  20
   5.1 Decoding Ballot QR Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
   5.2 Defeating QR Code Authentication . . . . . . . . . . . . . . . . . . . . . . . .  21
   5.3 Demonstration Hardware-Based Attack . . . . . . . . . . . . . . . . . . . . .  23
6 Attacks Against ICX Smart Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
   6.1 Extracting Election Secrets from Poll Worker Cards . . . . . . . . . . .  28
   6.2 Forging Technician Cards to Install Malware on any ICX . . . . . . .  29
   6.3 Creating "Infinite" Voter Cards . . . . . . . . . . . . . . . . . . . . . . . . .  30
7 Constructing ICX Malware . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
   7.1 Overview of the Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
   7.2 Obtaining the Real APK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
   7.3 Decompiling and Reverse-Engineering . . . . . . . . . . . . . . . . . . . . .  33
   7.4 Modifying the ICX App to Change Votes . . . . . . . . . . . . . . . . . . .  34
   7.5 Defeating Applicable Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
   7.6 Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
8 Installing Malware Locally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
   8.1 Attaching USB Devices to the ICX . . . . . . . . . . . . . . . . . . . . . . . .  39
   8.2 "Escaping" the ICX App . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
   8.3 Accessing a Root Shell via the Built-In Terminal App . . . . . . . . . .  43
   8.4 Manual Malware Installation Process . . . . . . . . . . . . . . . . . . . . . .  43
   8.5 Automating Malware Installation . . . . . . . . . . . . . . . . . . . . . . . . .  44
   8.6 Local Malware Installation using a Forged Technician Card . . . . .  45
   8.7 Local Malware Installation via Android Safe Mode . . . . . . . . . . . .  46
9 Installing Malware Remotely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48
   9.1 ICX Election Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

REDACTED VERSION

9.2    Directory Traversal Vulnerability .................................  50
9.3    Arbitrary Code Execution as Root.................................  50
9.4    Installing Malware from the Election Definition File ...........  51
9.5    Defeating Security Precautions More Easily ....................  52
9.6    Conclusions.........................................................  53
10 Manipulating Logs and Protective Counters ........................  54
10.1   Vulnerable Storage Design ......................................  54
10.2   Manual and Automated Modification .........................  55
11 Weaknesses in the ICP Scanner .....................................  56
11.1   The ICP Accepts Photocopied Ballots .......................  56
11.2   A Dishonest Poll Worker with Access to the ICP Memory Card
       can Deanonymize All Voted Ballots ...........................  56
11.3   Installed Tamper-Evident Seal could be Bypassed or Defeated ...  57
Expert Qualifications ..................................................  60
References ..............................................................  61
Exhibit A: October 2020 Software Update Instructions ................  67
Exhibit B: Georgia Logic and Accuracy Procedures....................  78
Exhibit C: Pro V&V Field Audit Report .............................  90

REDACTED VERSION

## 2   Georgia's Voting Equipment

As of November 2020, approximately 24 states used one or more components of the Dominion Democracy Suite voting system [88], which encompasses various models and versions of ballot scanners, BMDs, and election management system software. Georgia uses Democracy Suite version 5.5–A, including ImageCast X Prime (ICX) BMDs, ImageCast Precinct (ICP) precinct-count optical scanners, ImageCast Central (ICC) central-count optical scanners, and the Democracy Suite EMS.

My analysis focuses on the ICX BMD. In 2020, the ICX was used in parts of 16 states: Alaska, Arizona, California, Colorado, Georgia, Illinois, Kansas, Louisiana, Michigan, Missouri, Nevada, New Jersey, Ohio, Pennsylvania, Tennessee, and Washington. Although the vast majority of jurisdictions provide the ICX BMD to voters on request to assist with accessibility, Georgia is the only state to mandate ICX BMDs as the primary method of in-person voting state-wide [89].

### 2.1   Certification and Testing History

Democracy Suite 5.5–A is the successor to version 5.5, which was certified by the U.S. Election Assistance Commission (EAC) in September 2018 under the Voluntary Voting Systems Guidelines (VVSG) 1.0 (2005) standard [85, 86] following testing by Pro V&V, an EAC-accredited Voting System Test Laboratory (VSTL) [67]. Version 5.5–A was certified in January 2019 as a modification to 5.5. As a modification, it required only limited review, which was conducted by another VSTL, SLI Compliance [74].

Georgia entered into an agreement to purchase 5.5–A in July 2019 [34], and the Secretary of State engaged Pro V&V to evaluate it against state requirements. This evaluation was completed in August 2019 [66], and, two days later, the Secretary of State certified that the system was "in compliance with the applicable provisions of the Georgia Election Code and Rules of the Secretary of State" [33].

Over the past four years, Democracy Suite has been the subject of security testing on at least seven occasions as part of state certification processes in other states, as summarized in Table 1. In California and Pennsylvania, tests were conducted by Pro V&V and SLI, and in Texas by statutorily appointed examiners. These tests involved source code review and/or hands-on testing. Some of the tests raised serious concerns, but only Texas declined to certify the Dominion system. Based on the public test reports, it appears that none of these tests uncovered the critical security issues that I document here.

### 2.2   ImageCast X Hardware and Software

The ICX [25] is an Android-based touch-screen device that can be operated as either a BMD or a DRE. In Georgia, it is exclusively used as a BMD, allowing voters to mark ballots on-screen and print them to an attached laser printer.

The ICX hardware, shown in Figure 1, is a commercial off-the-shelf (COTS) Avalue HID-21V-BTX-B1R "Industrial Panel PC" [8]. On the front of the

9

REDACTED VERSION

| Date | Version | State | VSTL | Findings | Result |
|------|---------|-------|------|----------|--------|
| Oct 2017 | 5.2 | CA | SLI | Issues related to audit logging, passwords, anti-virus, and installation | Accept [13, 77, 78] |
| | | | | Potential vulnerability related to software execution from attached USB drive | |
| Oct 2018 | 5.5 | PA | SLI | Concerns regarding system hardening documentation | Reject [64] |
| Jan 2019 | 5.5–A | PA | SLI | None | Accept [64] |
| Jun 2019 | 5.5 | TX | — | "concerns about whether [it] preserves the secrecy of the ballot [and] operates efficiently and accurately" | Reject [27] |
| Oct 2019 | 5.10 | CA | SLI | Issues related to audit logging, passwords, anti-virus, and installation | Accept [12, 75, 76] |
| Jan 2020 | 5.5–A | TX | — | "concerns about whether [it] operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation" | Reject [28] |
| Jul 2020 | 5.10–A | CA | Pro V&V | None (source-code only) | Accept [55, 65] |

Table 1: **Prior Security Testing During State Certifications.** Various versions of the ICX and ICP were subjected to forms of security testing during state certification tests in California, Pennsylvania, and Texas. Although some tests flagged concerns, only Texas declined to certified the equipment. None of these tests appear to have uncovered the critical security issues we found.

device, there is a 21.5-inch touch-screen display and a smart-card slot used for authentication. On the back, there are four externally-accessible compartments covered by plastic doors: three containing various ports and the machine's power button, and one with a battery for backup power.

The ICX I tested runs a modified version of the Android 5.1.1 ("Lollipop"). This version of Android was released in December 2015. Even at that time, the next major version of Android ("Marshmallow") had been available for months. Today, the current release is Android 11, which shipped in September 2020 [3].

Most of the ICX's functionality is provided by an Android application developed by Dominion, which I will refer to as the "ICX App". Unlike with consumer phones and tablets, the ICX App is not distributed through an "app store" (and could not be without connecting the ICX to the Internet). Instead, it is installed through a process called "side-loading", in which an Android application package (APK) file containing the software is loaded from a USB device.

The ICX App itself does not contain any election-specific information, such as races or candidates. Rather, these are loaded to the device from a USB drive before each election, in the form of an election definition file created using the Democracy Suite EMS software.

10

REDACTED VERSION



(a) ImageCast X [8]          (b) ImageCast Precinct [23]

Figure 1: **The ICX BMD and ICP Scanner Used in Georgia**

### 2.3   ImageCast Precinct Hardware and Software

While not the focus of this study, I briefly examined the ICP scanner. The ICP [23], shown in Figure 1, is used to count voted ballots. It can process ballots that are produced by the ICX or those that are marked by hand. Inserted ballots are automatically pulled through the paper path, scanned on both sides, and deposited into a ballot box.

In contrast to the ICX, the ICP uses a custom hardware design. A small touch-screen display provides administrative controls and feedback to voters. A built-in thermal printer produces "poll tapes" that record vote tallies. Whereas the ICX uses standard smart cards for user authentication, the ICP uses a device called an iButton [47], which Dominion refers to as a "security key".

There are three externally-accessible compartments on the ICP, all with plastic doors that can be covered with a tamper-evident seal. A compartment on the right side contains a USB Type-A port and an RJ-45 jack. On the front are two compartments for inserting Compact Flash cards used to load the election definition and store results.

The ICP I tested runs a variant of the Linux operating system, $\mu$Clinux version 20070130. $\mu$Clinux is a Linux variant intended for use in embedded devices; version 20070130 was released in February 2007 [83] and is more than 14 years older than the most recent Linux version. A custom application named `cf200.sig` runs on top of $\mu$Clinux and provides most of the scanner's functionality.

# Exhibit 14

| | |
|---|---|
| **From:** | Barnes, Michael |
| **To:** | Scott Tucker |
| **Subject:** | [EXTERNAL] RE: L&A Export to State |
| **Date:** | Wednesday, January 15, 2020 10:07:58 AM |

They can use the USB that the state has previously provided.  However, I do expect us to be providing another drive in the future.

**From:** Scott Tucker <scott.tucker@dominionvoting.com>
**Sent:** Wednesday, January 15, 2020 9:44 AM
**To:** Barnes, Michael <mbarnes@sos.ga.gov>
**Subject:** FW: L&A Export to State

**EXTERNAL EMAIL:** Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Michael, is the state providing new USB drives for the counties to send their L&A exports and E-Day exports to you on or should they use the USB drive they have from the previous system?

**Scott Tucker** - CRM, GA
Scott.Tucker@dominionvoting.com
440.242.7451

GAsupport@dominionvoting.com
1-844-271-5371

**From:** Dedrick Smith <dedrick.smith@dominionvoting.com>
**Sent:** Wednesday, January 15, 2020 09:41
**To:** Scott Tucker <scott.tucker@dominionvoting.com>
**Subject:** L&A Export to State

Hello,

   I was wondering if you could ask the state if there is a special usb they are supposed to be sending out to the counties to submit their L&A exports and the exports for election day. They have a usb that they normally send the export files on, but they are old. So we need to know if they can use those or if the state will be sending new usbs out.

Thanks,
Dedrick Smith

PLAINTIFF EXHIBIT

**37**

1:17-cv-02989

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,514 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-counting feature of Microsoft Word 2016.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2022 in Times New Roman 14-point font.

Dated:  December 29, 2023                           /s/ Joseph R. Palmore

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on December 29, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  December 29, 2023                        /s/ Joseph R. Palmore